**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

PATRICIA ANN MEDVEY,                          : CIVIL ACTION NO.
                                                3:01CV1977(EBB)
            Plaintiff,

v.                                            :

OXFORD HEALTH PLANS, INC. AND
METROPOLITAN LIFE INSURANCE
COMPANY,

            Defendants.                       : NOVEMBER 24, 2004


**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO OXFORD HEALTH PLANS, INC. MOTION FOR SUMMARY JUDGMENT**
**DATED SEPTEMBER 15, 2004.**


Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff, Patricia Ann

Medvey, through her attorney and pursuant to Local Rule 56(c) of the Local Civil Rules of

the United States District Court for the District of Connecticut, states her opposition to

Defendant's Motion for Summary Judgment dated September 15, 2004. Plaintiff annexes

hereto, in accordance with Local Rule 56(c)2, Plaintiff's statement in response to

Defendant's Rule 56(c)1 assertions. In addition, in accordance with local rule, Plaintiff

includes her list of material facts to which it is contended there is a genuine issue to be

tried.

THE PLAINTIFF,
PATRICIA ANN MEDVEY

By: _____

Edmond Clark
83 Scotland Avenue
Post Office Box 133
Madison, CT  06443-0133
Telephone: (203) 245-4602
Facsimile: (203) 245-9734
E-Mail: Eclarkmadisonlaw@aol.com
Federal Bar No.  ct22396
Her Attorney.

## TABLE OF CONTENTS

PAGE

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT ......... 1

I.     INTRODUCTION ......... 1

II.    PLAINTIFF'S STATEMENT OF FACTS ......... 2

III.   LEGAL ARGUMENT ......... 19

       A.  Summary Judgment Standard. ......... 19

IV.    SUMMARY JUDGMENT SHOULD BE DENIED TO OXFORD
       HEALTH PLANS, INC. ON COUNTS FIVE AND SIX FOR
       REASONS OF PLAINTIFF MEDVEY'S BONA FIDE DISABILITY
       WITHIN THE MEANING OF THE AMERICANS WITH
       DISABILITIES ACT AND THE REHABILITATION ACT. ......... 21

       A.  Plaintiff States A *Prima Facie* Claim Within The Americans With
       Disabilities Act And The Rehabilitation Act. ......... 21

V.     A GRANT OF SUMMARY JUDGMENT IS NOT APPROPRIATE
       FOR COUNT FOUR IN THAT MEDVEY WAS DISCHARGED BY
       OXFORD WHILE SUFFERING A DISABILITY AND A CHRONIC
       HANDICAP, INFIRMITY OR IMPAIRMENT AS REQUIRED BY
       CONN. GEN. STAT. SEC. 46a-60(a)(1). ......... 31

       A.  Plaintiff Medvey Suffers a Disability Within the Meaning of
       Connecticut General Statute Section 46a-51(15). ......... 32

       B.  Plaintiff Medvey, After Informing Oxford Health Plans of Her
       Disability Was Rejected For Existing Positions at Oxford Health Plans. ......... 35

       C.  Plaintiff Medvey By Virtue of Her Rejection by Oxford Health
       Plans Suffered An Adverse Employment Decision. ......... 36

       D.  Circumstances Present Give Rise To Finding A Reasonable
       Inference Of Discrimination. ......... 36

       E.  Oxford Health Plans' Defense of Financial and Business
       Interests as Legitimating Its Actions is Not Plausible. ......... 36

i

F.  The Business Interest Decision Making Claim of Oxford
Health Plans, Inc. Is Pretextual.                                        37

VI.  A GRANT OF SUMMARY JUDGMENT IS NOT APPROPRIATE
FOR COUNT SEVEN IN THAT MEDVEY WAS ENGAGED IN
A PROTECTED ACTIVITY WHEN SHE SUFFERED THE ADVERSE
EMPLOYMENT ACTION OF TERMINATION.                                        39

A.  Plaintiff Was Engaged in Protected Activity Under ADA.               39

B.  The Actions of Oxford Health Plans, Inc. Was Adverse Employment
Action Taken Against Plaintiff Medvey.                                   40

C.  Plaintiff Claims A Causal Link Between The Protected Activity
And Defendant's Adverse Employment Action.                              41

VI.  CONCLUSION.                                                         41

ii

## **TABLE OF AUTHORITIES**

<u>CASES</u>

*Ann Howard's Apricots Rest., Inc. v. Comm'n on Human Rights and Opportunities*, 237 Conn. 209, 676 A.2d 844 (Conn. 1996))                31

*Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L.Ed. 2d 540 (1998).                22

*Burtnieks v. City of New York*, 716 F.2d 982 (2d Cir. 1983).                20

*Carothers v. Capozzielo*, 215 Conn. 82 (1990)                32

*Caruso v. Siemens Business Systs., Inc.* 2003 WL 174791 (2d Cir. (Conn.) Jan. 23, 2003).                34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).                19

*Cino v. Sikorsky Aircraft et al.*, 42 F.Supp. 2d 147 (D.Conn. 1998).                21

*Connor v. McDonalds*, 2003 WL 1343259, (D.Conn. 2003).                34

*First Nat'l Bank of Cincinnati v. Pepper*, 454 F.2d 626, 629 (2d Cir. 1972).                20

*Gambarbella v. Yale University*, No. CV000439693S, 2003 WL 22133747, (Conn. Super. Ct. Aug. 27, 2003)                35

*Irby v. New York City Transit Authority*, No. 99 CIV. 2172, 2000 WL 1634413 (S.D.N.Y. Oct. 30, 2000).                35

*Johnson v. Palma*, 931 F.2d 203 (2d Cir.1991).                36

*Kilpatrick v. Board of Education*, 206 Conn. 25, 535 A.2d 1311 (Conn. 1998).                32

*Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986).                20

*Lester v. Natsios*, 290 F. Supp. 2d 11 (D.D.C. 2003).                28

*Levy v. Commission on Human Rights and Opportunities*, 236 Conn.96 (Conn. 1996).                31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).                19

*Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144 (2d Cir. 1998).                21

*Sacay v. The Research Foundation of the City University of New* York,
44 F.Supp.2d 505 (E.D.N.Y.) 1999).                                                    36

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155 (2d. Cir. 1999).        36

*Shaw v. Greenwich Anesthesiology Assocs.*, 137 F.Supp. 2d 48 (D.Conn. 2001).         31

*Smith v. Blue Cross Blue Shield, Inc.*, 894 F. Supp. 1463 (D. Kan. 1995).            19

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139 (1999).            20

*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*,
534 U.S. 184, 122 S. Ct. 681, 151 L.Ed. 2d 615 (2002).                               22

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962).                                20


## STATUTES

Conn. Gen. Stat. Sec. 46a-60(a)(1)                                                   31

29 C.F.R. Sec. 1630.2(i)                                                              23

29 C.F.R. Sec. 1630.2(j)                                                              25

42 U.S.C. Sec. 12203                                                                  39

42 U.S.C. Sec. 12112(a)                                                               21

42 U.S.C. Sec. 12102(2)                                                               21

Conn. Gen. Stat. Sec. 46a-51(15)                                                      32


## SECONDARY SOURCES

Black's Law Dictionary at 241-42 (6th ed. 1990).                                   33

EEOC Enforcement Guidance: Reasonable Accommodation and Undue
Hardship Under the Americans with Disabilities Act, October 17, 2002,
Job Restructuring Section                                                            27

Webster's New World Medical Dictionary Second Edition (2003).                        33

iv

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO MOTION FOR SUMMARY JUDGMENT.**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff, Patricia Ann

Medvey, through her attorney and pursuant to Local Rule 56(c) of the Local Civil Rules of

the United States District Court for the District of Connecticut, states her opposition to

Defendant's Motion for Summary Judgment dated September 15, 2004.

## I. INTRODUCTION

Plaintiff, Patricia Ann Medvey ("Medvey") filed an Amended Complaint dated

May 21, 2002 ("Amended Complaint"). She seeks to recover damages from Oxford

Health Plans, Inc. ("Oxford"), for causes of action related to her disability and its effects

upon her employment and benefits with Oxford, and her subsequent termination from

employment by Oxford.

Medvey seeks a remedy under the following theories:

1. Count Four: disability discrimination under the Connecticut Fair Employment

Practices Act, Conn. Gen. Stat. Sec. 46a-51 *et seq.*;

2. Count Five: failure to provide reasonable accommodation under the Americans

With Disabilities Act, 42 U.S.C. Secs. 12101-17;

3. Count Six: violation of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, and

4. Count Seven: retaliation.

## II. PLAINTIFF'S STATEMENT OF FACTS.

Medvey was hired by Oxford on October 27, 1997. Def. Ex. B, Medvey Dep. II, 46-47. Medvey's disability (hereinafter her "Condition") resulted from injuries sustained in an auto accident in June of 1987 ("the Accident"), prior to her employment by Oxford. Defendant Exhibit C, Medvey Dep. III, 55.

Medvey is not a doctor, nor medical professional. Plaintiff Exhibit E, Medvey Dep. V, 5. Medvey's education consists of certification as a Certified Nurse's Assistant from Norwalk Community College, (Plaintiff Exhibit A, Medvey Dep. I, 22.); an Associate in Science Degree in marketing, and secretarial and real estate related coursework. Plaintiff Exhibit D, Medvey Dep. IV, 129; Pl. Ex. F, Def. Dep. Ex 12.

Medvey Prior to Employment with Oxford.

Prior to her Accident, Medvey was employed in a variety of jobs including payroll clerk, (Plaintiff Exhibit A, Medvey Dep. I, 11.); junior accounting clerk, (*Id.*, 12.); food service, (*Id.*); phone company service representative, (*Id.*, 13.); bridal show coordinator, (*Id.*, 14.); receptionist, (Plaintiff Ex. C, Medvey Dep. III, 61.); and, real estate agent, (Plaintiff Exhibit A, Medvey Dep. I, 15.). Prior to the date of her Accident Medvey was married, (Plaintiff Exhibit A, Medvey Dep. I, 12.); and, Medvey had children, (*Id.*, 13.).

Between the date of the Accident and October of 1997, the date of her employment with Oxford, Medvey was treated by a variety of doctors and physicians including Robert Brown, M.D., Psychiatrist. Plaintiff Ex. B, Medvey Dep. II, 84-85. Medvey was treated at the Jill

- 2 -

Cohen Rehabilitation Center [Institute] and tested there by Eugene Piesetsky, M.D. and diagnosed as suffering traumatic brain injury. Plaintiff Ex. C, Medvey Dep. III, 20; Plaintiff Ex. E, Medvey Dep. V, 5. Medvey was also treated by Stephen Rabinowitz, M.D., Ophthalmologist. Plaintiff Ex. D, Medvey Dep. IV, 72. Subsequently, Medvey was treated by Robert Lesser, M.D., Neuro-opthalmologist. Plaintiff Ex. B, Medvey Dep. II, 100.

During the time between the Accident and her employment with Oxford, Medvey cared for a hospice patient in her home. Plaintiff Ex. A, Medvey Dep. I, 17-18; Plaintiff Ex. C, Medvey Dep. III, 56. At times, Medvey lacked the necessary physical stamina for this work. Plaintiff Ex. A, Medvey Dep. I, 28. Medvey also worked part-time for her husband's business, (Plaintiff Ex. C, Medvey Dep. III, 56); and did part-time sales work, (Id., 57-58.). At times Medvey felt "over stimulated" by the work environment and fatigued by the pressure of the job. Plaintiff Ex. A, Medvey Dep. I, 27-28. During this period Medvey had the assistance of someone to help with her housework. Id., 29-30.

On several occasions subsequent to her Accident, and prior to employment with Oxford, Medvey sought reasonable workplace accommodations for her disability under her then existing employment arrangements. Medvey made these accommodations by virtue of limiting her hours and working at her own pace. Plaintiff Ex. C, Medvey Dep. III, 60.

## Medvey's Employment with Oxford.

Medvey was interviewed by Oxford's Human Resources Department in October 1997. Plaintiff Ex. A, Medvey Dep. I, 32. Medvey interviewed for two positions – one in the Issue

and Resolution Department, the other as a Designated Service Manager ("DSM"). *Id.* Medvey

was hired by Oxford on October 27, 1997 in the position of a Dedicated Service Manager, which

is a customer service position. Def. Ex. B, Medvey Dep. II, 46-47. The DSM position involved

receiving telephone calls ("Calls") from Oxford members [clients] who had questions or issues

with respect to the Oxford insurance benefits coverage. Def. Ex. A, Medvey Dep. I, 36. Calls to

a DSM came in through a queue, which is like a holding tank for calls from those calling and

waiting to ask questions of an Oxford representative. *Id.* The DSM position required the use of

multiple, moving (scrolling) computer screens to respond to the Calls of Oxford members. Def.

Ex. B, Medvey Dep. II, 67. Medvey realized the position for which she was being trained

involved taking calls from the queue via headsets. *Id.,* 25. Medvey suffers work related stress

when dealing simultaneously with multiple, moving computer screens while engaged through

head phones. Plaintiff Ex. C, Medvey Dep. III, 9. In recognizing the difficulty the multiple,

moving computer system of the DSM position creates for her, Medvey expressed, in the very

first week of her training, to her instructor, her concern about being plugged into a headset with a

queue waiting, and requested release from the training class. Def. Ex. B, Medvey Dep. II, 25-27.

She requested consideration for an available position in the Issues and Resolution Department.

*Id.* The instructor told Medvey that after three months of this customer service work she would

be eligible for different job duties and opportunities. Plaintiff Ex. A, Medvey Dep. I, 37. The

instructor told Medvey he was going to recommend she not stay in the queue. *Id.,* 38.

From the very beginning of her employment with Oxford, Medvey expressed concerns to

her group leader, Laurie Willett, about her difficulty with the headset and queue. Plaintiff Ex. B,

– 4 –

Medvey Dep. II, 30. While working with head phones, the queue and the multi screen computer programs, Medvey became dizzy, anxious and suffered headaches and feelings of sickness. Plaintiff Ex. D, Medvey Dep. IV, 57.

In her first actual assignment, Medvey operated as a Medicare phone representative. She performed well, exceeding department standards of productivity. Def. Ex. B, Medvey Dep. II, 51-53; Def. Ex. F, Dep. Ex. 15, p.2. In January of 1998, Medvey was assigned to the Medicare Group Accounts section, where she had a smaller queue. The transfer was made at her request because of problems she experienced with large call volumes during her training. Def. Ex. A, Medvey Dep. I, 36-38. She exceeded the standards of productivity in that department also. Def. Ex. B, Medvey Dep. II, 55; Def. Ex. F, Dep. Ex. 16, p.2.

Although Medvey received favorable performance evaluations for her work at Oxford, her achievement came with great difficulty and with the assistance of medication. Plaintiff Ex. B, Medvey Dep. II, 58-59, 67. Working with the headset made Medvey physically ill and taking medication in order to do the job. Plaintiff Ex. A, Medvey Dep. I, 47. The conflict for Medvey of the multiple, moving computer screens while she is engaged through head phones cause her to become anxious, nauseas, dizzy and off balance. Plaintiff Ex. C, Medvey Dep. III, 9-11. The computer program Medvey was operating as a DSM might have seven programs running simultaneously. Plaintiff Ex. A, Medvey Dep. I, 48. Her ability to concentrate, remember and manage her time all become affected. *Id.,* 12. She has experienced times when she is too dizzy to drive. *Id.,* 13. And, incidents where she is "jumpy," sensitive to sound and suffering "startle reflex." *Id.,* 14. Medvey provided to Oxford, a doctor's note from her ophthalmologist, to

Rabinowitz, dated May 6, 1998. Def. Ex. D, Medvey Dep. IV, 44-45; Ex. F, Dep. Ex. 20. The note stated, in pertinent part, "the use of multi screens at work at fast pace is not appropriate for Pat [Medvey]." *Id.* Medvey's alleged disability is brain dysfunction frontal lobe injury and visual disturbance, sufficient in degree to preclude the necessary functioning for operating Oxford's multi-screen computer program processes. Amended Complaint, Secs. 8 and 11; Def. Ex. B, Medvey Dep. II, 119-121; Ex. F, Dep. Ex. 39 (Responses #1 and 14).

Medvey asked about being taken off the headsets. Def. Ex. C, Medvey Dep. III, 49. Medvey was aware of the "busy out" or "not ready" capability available through the call system by which waiting calls in the queue would be sent on to another representative. *Id.* Medvey was, as well, aware of the rules for using the "not ready" capability, which restricted its use – "for breaks, your lunch." *Id.* In recognition of Medvey's limitations, Medvey's supervisors, Laurie Willett and Mike Trombley, told her that she was doing a good job and she should pace herself. Def. Ex. A, Medvey Dep. I, 40; Def. Ex. B, Medvey Dep. II, 30, 71. Medvey indicated to her supervisors that pacing herself was very hard. Def. Ex. A, Medvey Dep. I, 40. The queue provided calls in a manner that would not allow for finishing writing and resolving the issues of one call prior to another call coming in. *Id.* Medvey told Laurie Willett she was having difficulty with the queue and with tension. *Id.* Medvey continued to be overwhelmed with the queue. *Id.*

In May of 1998, after receipt of the note from Dr. Rabinowitz of May 6, 1998, (Def. Ex. 20), Oxford assigned Medvey to Oxford's Correspondence Initiative ("Correspondence Initiative") in the Issues and Resolution Department in an effort to accommodate her disability.

– 6 –

Def. Ex. B, Medvey Dep. II, 57-58; Def. Ex. A, Medvey Dep. I, 40-41. Medvey worked in the Issues and Resolution Department, very successfully looking for and finding duplicate claims, for three months. Def. Ex. A, Medvey Dep. I, 41. Medvey thought, as did Laurie Willett, the Correspondence Initiative position might become a full-time position. *Id.* Medvey had no awareness of the business climate at Oxford where issues were of downsizing at the time she was requesting assignment to a position other than the DSM with need for its headsets and a queue. Plaintiff Ex. B, Medvey Dep. II, 29-30.

Mike Trombley, the team captain for the position of DGSA, was aware in 1998 Medvey had a problem concentrating, prioritizing and becoming overwhelmed due to the use of head phones, the queue and the multi screen computer programs. Plaintiff Ex. D, Medvey Dep. IV, 52; Pl. Ex. F, Dep. Ex. 24 (Def.).

On August 25, 1998, Medvey complained to her supervisor in an e-mail ". . . Dr. Rabinowitz . . . has indicated that the use of multiple screens at a consistently fast pace is not appropriate for me because it affects my vision and induces a physical state of vertigo. The Essential Functions of the Customer Service Job description that you gave me are all accomplished with the use of multiple screens at a fast pace while answering a large volume of customer calls." Def. Ex. F, Dep. Ex. 18.

A few weeks later, the Medicare Group Accounts department was moved to New Hampshire. Def. Ex. C, Medvey Dep. III, 159-160. With this change Medvey was faced with three choices: take a DGSA position, some form of severance, or a position in claims. *Id.*, 160. Medvey declined the severance for a lot of reasons including being "at an age where I wanted to

stay there [Oxford]." Plaintiff Ex. A, Medvey Dep. I, 58. She did not apply for the position in

the Claims Department because it was "9 hours on the computer doing nothing but looking up

claims." Def. Ex. A, Medvey Dep. I, 43. Medvey indicated the claims position meant sitting

and processing claims, "multiple screens and the computer all day." Plaintiff Ex. C, Medvey

Dep. III, 160 "It was a lot of pressure. It wasn't an option for me." *Id.*

  With no other options available to her, Medvey applied for the DGSA position on

September 17, 1998. Def. Ex. F, Dep. Ex. 19; Def. Ex. B, Medvey Dep. II, 69. Medvey began

work as a DGSA in October 1998. Def. Ex. B, Medvey Dep. II, 78-81.

  Medvey sought other opportunities at Oxford and applied for several positions including

one in the Issues and Resolution Department and DSM. Plaintiff Ex. B, Medvey Dep. II, 70.

Medvey also made inquiries about any other available positions. *Id.*, 71. Medvey's inquiries

about other positions were not always made formally. *Id.*, 73. Medvey searched for job

openings at Oxford by accessing Oxford's on-line, via internet, data base in January 1999.

Plaintiff Ex. D, Medvey Dep. IV, 100-101; Plaintiff Ex. F, Dep. Ex. 1.

  Medvey regarded both Laurie Willett and Mike Trombley as "advocates" who tried to

help her. Def. Ex. B, Medvey Dep. II, 57-58, 78-81; Def. Ex. D, Medvey Dep. IV, 20-21.

Before Medvey applied in 1998, she and Laurie Willett spent a lot of time talking about the

DGSA position – how it was a good fit for Medvey and how she would be able to work at a

different pace than the DSM position while maintaining her quality of service. Plaintiff Ex. B,

Medvey Dep. II, 69.

– 8 –

On May 19, 1999, Medvey applied for and was granted a medical leave of absence from May 22, 1999 to June 13, 1999. Def. Ex. F, Dep. Exs. 26, 29; Def. Ex. B, Medvey Dep. II, 83-84. Medvey, and her physicians, provided information on her Condition directly to MetLife. Plaintiff Ex. D, Medvey Dep. IV, 80-81; Pl. Ex. F, Dep. Ex. 37 (Def.). MetLife's relationship with Medvey was by way of administering the Plan on behalf of Oxford. Def. Ex. H., Orsaia Affidavit, Para. 6-7. Medvey's psychiatrist, Dr. Harry Brown, who had been treating her since 1991, in his note dated May 19, 1999, in support of a leave of absence, indicated "Difficulty concentration and organization [sic] work related demands. Eye strain, dizziness, and nausea, resulting in temporary decreased performance." Def. Ex. F, Dep. Ex. 27; Def. Ex. B, Medvey Dep. II, 84-85.

Medvey was assured by Oxford managers Linda Salomone and Mike Trombley that taking a leave of absence would not effect her position with Oxford nor reflect upon her employment with Oxford. Plaintiff Ex. B, Medvey Dep. II, 38.

Medvey's leave of absence was extended from June 14, 1999, to June 27, 1999. Def. Ex. F, Dep. Ex. 30; Def. Ex. B, Medvey Dep. II, 88-89. Medvey relied upon the statements and recommendations of Drs. Brown, Lesser and Rabinowitz in indicating to Oxford and MetLife she could return to work from leave of absence with limitations on multiple-screen computer work. Plaintiff Ex. D, Medvey Dep. IV, 85. When Medvey returned to work on June 28, 1999, she had a note from Dr. Brown that stated, "[w]ork on computer may not be appropriate at this time. Best to have limited exposure." Def. Ex. F, Dep. Ex. 31; Def. Ex. B, Medvey Dep. II, 89-93.

- 9 -

Pat Orsaia, an Oxford Human Resource Manager, was informed that Medvey had returned to work with the above note and that she was at her desk working on the computer. Def. Ex. H, Orsaia Affidavit, Paras. 6-7. To comply with Medvey's doctor's request, Medvey was given some temporary duties to perform. *Id.*, Para. 8. In the meantime, Orsaia contacted MetLife to discuss Medvey's status. *Id.* MetLife was the claims administrator and insurer for Oxford's disability program (the ERISA Plan"). Amended Complaint, Sec. 6; Def. Ex. I, Affidavit of Jeanne Rudell, Secs. 5 and 6.

Because of the limits placed upon her return by her physician, Oxford and MetLife determined that Medvey could not return to work at that time. Def. Ex. H, Orsaia Affidavit, Para. 9. Upon being told she had to leave the workplace, Medvey went to Human Resources to inquire about other open positions of which she was aware. Plaintiff Ex. A, Medvey Dep. I, 56. Medvey was told, without explanation, an open "runner position" was not available to her. *Id.* Oxford decided the only accommodation it could provide for Medvey at this time was to continue her disability leave of absence until she could return to her position, which required full-time use of the computer, or until Oxford could find Medvey an alternative position for which she would be qualified. Def. Ex. H, Orsaia Affidavit, Para. 10. Medvey offered to take anything including receptionist work at reduced hours and reduced pay. Plaintiff Ex. A, Medvey Dep. I, 56. Oxford refused Medvey any job. *Id.* Oxford was not forthcoming with an alternate position for Medvey over the next several months. Def. Ex. H, Orsaia Affidavit, Para. 11.

On August 18, 1999, Robert Lesser, M.D., a neuro-ophthalmologist, wrote that Medvey "should switch her job to something that does not involve <u>as much work with a computer screen</u>." [emphasis added] Plaintiff Ex. D, Medvey Dep. IV, 75; Def. Ex. F, Dep. Ex. 37, p. 3.

Medvey continued to explore the possibility of remaining at Oxford with both Oxford and MetLife. Plaintiff Ex. D, Medvey Dep. IV, 144; Pl. Ex. F, Dep. Ex. 18. MetLife's "Daily Review – Report" indicates Medvey attempted to return to work on June 29, 2004, (Pl. Ex. F, Dep. Ex. 18, p. 8 of 23.), and made inquiry on a variety of occasions to MetLife case managers in an effort to return to work, including July 9, 1999, (*Id.*, p. 9 of 23.), September 3, 1999, (*Id.*, p. 15 of 23.) and, November 9, 1999, (*Id.*, p. 20 of 23.).

<u>Medvey's "Limitations" and "Impairments."</u>

Aside from her difficulties with moving, multiple computer screens, Medvey claims that she can also be "symptomatic" when not in that situation. Def. Ex. B, Medvey Dep. II, 113-114. Her symptoms are brought on as reactions to outside forces. Def. Ex. C, Medvey Dep. III, 7. Medvey agreed that these symptomatic episodes are almost like "attacks." "They don't happen all the time." Def. Ex. B, Medvey Dep. II, 114. For example, Medvey can become symptomatic when faced with certain stressful personal situations, such as caring for her pregnant daughter, helping her son buy a house, or caring for her elderly relatives. Def. Ex. C, Medvey Dep. III, 12-13. Medvey can become "jumpy" if a waiter drops a tray in a restaurant. *Id.*, 13-14. She also stated that she sometimes had difficulty sleeping. Def. Ex. B, Medvey Dep. II, 110-111; Ex. F,

– 11 –

Dep. Ex. 39, p. 2. Medvey also claims to have some difficulty "seeing" in certain situations, i.e.,

when she is "symptomatic." Def. Ex. F, Dep. Ex. 39, pp. 2-5; Def. Ex. B, Medvey Dep. II, 110-

123. While it is true Medvey has taken vacations since leaving Oxford, (Def. Ex. E, Medvey

Dep. V, 23-26), these were generally opportunities to accompany her children or friends in

travel. Plaintiff Ex. E, Medvey Dep. V, 23-25. She has, on many occasions, been prevented

from lengthy travel on car trips, as either a driver or a passenger, such as Connecticut to

Vermont, for reasons of dizziness and nausea and a state of vertigo. Plaintiff Ex. C, Medvey

Dep. III, 166.

Medvey was diagnosed as suffering traumatic brain injury by Harry Brown, M.D. in

1993. Plaintiff Ex. E, Medvey Dep. V, 4. Medvey was tested subsequent to the diagnosis of Dr.

Brown, by Doctor Eugene Piesetsky who made report to Dr. Brown. *Id.*, 5. See also, letter from

Harry Brown, M.D., Psychiatrist, dated February 18, 2004 describing Medvey's physical and

mental condition. Plaintiff Ex. D, Medvey Dep. IV, 116; Pl. Ex. F, Dep. Ex. 4. Medvey has

limitations brought about by an inability to perform manual tasks. Plaintiff Ex. D, Medvey Dep.

IV, 6. Medvey has problems walking, hearing, learning, lifting and working as a result of her

traumatic brain injury diagnosis. *Id.*, 6-7. Medvey has reduced concentration and memory

problems. *Id.*, 7-8. Medvey suffers word retrieval difficulties and instances of increased

irritability. *Id.*, 8. Medvey suffers increased anxiety, bouts with impulsiveness, and has been

diagnosed as suffering from depression. *Id.*, 9. Medvey has problems sleeping and suffers from

fatigue. *Id.*, 10.

Medvey made her Condition known to Oxford at the time of her hire and shortly

thereafter.  Plaintiff Ex. D, Medvey Dep. IV, 13-14, Pl. Ex. F, Dep. Ex. 11 (Def.); Plaintiff Ex.

D, Medvey Dep. IV, 15; Pl. Ex. F, Dep. Ex. 13 (Def.).  Oxford acknowledged Medvey's

difficulty with the multi-screen computer program during the first two months of her

employment.  Plaintiff Ex. D, Medvey Dep. IV, 17, 19.

Medvey's first performance review at Oxford, dated January 15, 1998, prepared by team

leader Laurie Willett, indicated Medvey as "having difficulty adapting to the pace of the

Medicare phones."  Plaintiff Ex. D, Medvey Dep. IV, 18; Pl. Ex. F, Dep. Ex. 15 (Def.).

Oxford recognized, through team leader Willett, Medvey's difficulty with the phones

again on October 5, 1998, Medvey's one year performance evaluation.  Plaintiff Ex. D, Medvey

Dep. IV, 19-20.  Oxford, through Willett, expressed concerns over Medvey's performance by

way of commenting on her "capability of serving the membership while on the phone.  Plaintiff

Ex. D, Medvey Dep. IV, 22; Pl. Ex. F, Dep. Ex. 16 (Def.).  Oxford was aware of Medvey's

problems with the multiple screens of the computer system on a continuing basis.  Plaintiff Ex.

D, Medvey Dep. IV, 31; Pl. Ex. F, Dep. Ex. 18 (Def.).  Medvey discussed her problems

stemming from the traumatic brain injury continuously from the date of her employment with

supervisors and managers at Oxford.  Plaintiff Ex. D, Medvey Dep. IV, 31.

Medvey describes the complexity and intensity of operating the multi-screen computer

system while using headsets and receiving calls from the queue.  Plaintiff Ex. D, Medvey Dep.

IV, 31-40; opening computer screens, searching programs, scrolling and flipping pages.  Plaintiff

Ex. D, Medvey Dep. IV, 113-114; Pl. Ex. F, Dep. Ex. 3.  The queue can have a hundred

- 13 -

incoming callers who have been waiting anywhere upwards of a half hour or 45 minutes.

Plaintiff Ex. D, Medvey Dep. IV, 33-35. After hanging up from one call, virtually finishing up,

another call comes through. *Id.*, 35-36. Fielding questions and resolving issues for callers often

required Medvey to access other Oxford departments and call back a caller. *Id.*, 37. Dealing

with other departments and calls from the queue occurred simultaneously and required accessing

multi-screens. *Id.*, 38. Oxford maintained goals for productivity and expected operators to

resolve issues and close out requests and inquiries in conformity with these standards. *Id.*, 39.

Medvey experienced dizziness, nausea, vertigo, reduced concentration, headaches and

anxiety. Plaintiff Ex. D, Medvey Dep. IV, 56-57. Oxford was aware of Medvey's diagnosis of

traumatic brain injury from Doctor Rabinowitz who on May 6, 1998 provided to Oxford by way

of Willett, his opinion that "the use of multi-screens at work at a fast pace is not appropriate for

Pat due to her right frontal injury causing some visual disturbance." Plaintiff Ex. D, Medvey

Dep. IV, 44-45; Pl. Ex. F, Dep. Ex. 20 (Def.).

Medvey believed Willett was attempting to respond to her requests for accommodation

for her Condition by seeking other job opportunities for her. Plaintiff Ex. D, Medvey Dep. IV,

48. Mike Trombley, Medvey's team captain for the position of DGSA, was aware of Medvey's

Condition. *Id.*, 52. Trombley indicated Medvey's Condition created issues for her of

concentrating, prioritizing and becoming overwhelmed. Plaintiff Ex. D, Medvey Dep. IV, 52; Pl.

Ex. F, Dep. Ex. 24 (Def.).

Oxford received from Doctor Brown on May 19, 1999 his description of Medvey as it

relates to her workplace demands by describing difficult concentration and organization. Eye

– 14 –

strain, dizziness and nausea. Plaintiff Ex. D, Medvey Dep. IV, 60-61; Pl. Ex. F, Dep. Ex. 27 (Def.). Medvey asserts, MetLife, through Barbara Birkett and others, received and reviewed the information provided to them from Doctor Brown. Plaintiff Ex. D, Medvey Dep. IV, 66-67; Pl. Ex. F, Dep. Ex. 28 (Def.).[1]

Dr. Brown provided a professional opinion of "physical and neurological limitations," "15% physical disability from herniated discs in her neck and soft tissue injury," "symptoms of Post Traumatic Shock Syndrome," and "Traumatic Brain Injury," – all results of Medvey's Accident. Plaintiff Exhibit D, Medvey Dep. IV, 115-117; Pl. Ex. F, Dep. Ex. 4.

In counseling with Dr. Brown during 1999, in efforts to stabilize Medvey's Condition, Doctor Brown determined and communicated to Oxford on June, 1, 1999 that working on the computer may not be appropriate for Medvey. Plaintiff Ex. D, Medvey Dep. IV, 69-70; Pl. Ex. F, Dep. Ex. 31 (Def.). Brown had recommended means for Medvey to medicate herself when circumstances so required. Plaintiff Exhibit D, Medvey Dep. IV, 115; Pl. Ex. F, Dep. Ex. 4.

At the suggestion of MetLife Nurse Barbara Burkett, Medvey was examined by Robert Lesser, M.D., a neuro ophthalmologist. Plaintiff Ex. D, Medvey Dep. IV, 71-72, 79. In a letter Lesser wrote that was made available to Oxford and MetLife, Lesser discussed Medvey's difficulty with multiple screens. Plaintiff Ex. D, Medvey Dep. IV, 71- 72; Pl. Ex. F, Dep. Ex. 37 (Def.). Lesser's writing raised the issue of motion disturbance and Medvey's use of eye glasses to which Medvey responds, her condition is not corrected simply by removing her glasses and

---

[1] Although it is not disputed that Brown's letter (Pl. Ex. F, Dep. Ex. 4) of this date (February 18, 2004) was not available to Defendant during the time of Medvey's employment, the information of it had been made available to Oxford during the time of her employment.

relying on mono-vision. Plaintiff Ex. D, Medvey Dep. IV, 73-74. Medvey's ability to function

and operate the multi-screen computer programs was not improved by wearing her glasses.

Plaintiff Ex. C, Medvey Dep. III, 165. Lesser recommends to Oxford that Medvey switch her

job to something that does not involve as much work with a computer screen. Plaintiff Ex. D,

Medvey Dep. IV, 75; Pl. Ex. F, Dep. Ex. 37 (Def.). MetLife, in recognizing the extent of

Medvey's Condition, realized her limitations "preclude[d] her from performing her job and

would benefit from a change in position." Pl. Ex. F, Dep. Ex. 18, p. 12 of 23.

Although Medvey indicated to Oxford and MetLife on September 20, 1999 she was, in

her personal opinion, "currently medically stable," (Plaintiff Ex. D, Medvey Dep. IV, 80-81; Pl.

Ex. F, Dep. Ex. 37 (Def.)), Medvey describes this description of her to mean her debilitating

vertigo and nausea had stabilized, as a result of her being on leave for the period leading up to

the date of this statement and away from the multi-screen computers for that period of time.

Plaintiff Ex. D, Medvey Dep. IV, 81-83; Pl. Ex. F, Dep. Ex. 39 (Def.).

Patricia Thal of MetLife, on September 15, 1999, indicated Medvey to be classified as

partially disabled for reasons of her limitations. Plaintiff Ex. D, Medvey Dep. IV, 87-90; Pl. Ex.

F, Dep. Ex. 42 (Def.).


<u>Medvey's Employment Subsequent to Oxford.</u>

While Medvey was hopeful to remain at Oxford for many reasons, she was counseled by

MetLife (Barbara Birkett and Patricia Thal) about securing other employment. Plaintiff Ex. A,

Medvey Dep. I, 58. With assurances from MetLife and Patricia Thal, Medvey sought

employment for which she was suited, until such time as something becomes available at Oxford. *Id.*, 60. Medvey was led to believe she would be "watched" by MetLife during the time of her temporary placement external to Oxford. Plaintiff Ex. D, Medvey Dep. IV, 96. Medvey was advised by Pat Orsaia, Oxford Human Resources, she (Medvey) was not being terminated by Oxford. *Id.*, 98-99. Medvey called Oxford Human Resources to inquire on open positions. Plaintiff Ex. A, Medvey Dep. I, 61. When told there was not anything available to her, Medvey accepted a position as a personal assistant with Mila Grieb, a real estate agent at Coldwell Banker at that time. *Id.* Throughout this period of time, Medvey understood that MetLife, on behalf of Oxford, would assess her limitations and provide vocational rehabilitation, if necessary, in order for her to return to a position at Oxford. *Id.*, 74.

In July 2001, Medvey was in contact with Oxford for reasons of reviewing possible job openings Oxford had made known to her by way of mailing copies of the job postings to her. Plaintiff Ex. C, Medvey Dep. III, 143; Ex. F, Dep. Ex. 59 (Def.). Medvey discussed jobs over the phone. *Id.*, 145. Medvey interviewed for an open position. *Id.*, 146. The position for consideration turned out to be unacceptable for reasons it was part-time and the hourly rate did not provide access to employee benefits. *Id.*, 147. Medvey reviewed several other job postings from Oxford. *Id.*, 148, 160; Ex. F, Dep. Ex. 60 (Def.). These led to discussions and interviews both in person and over the telephone. Plaintiff Ex. C, Medvey Dep. III, 148, 152. With one minor exception, Medvey did not fit the qualifications of the jobs represented by the postings *Id.*, 148. Many of the jobs were clearly beyond the capability of Medvey, in that their requirements stated a need for a higher education level than she had. *Id.*, 149. Many of the job

– 17 –

postings, when she received them, came with already expired closing dates for application. *Id.* 150.

Though she never received a letter of termination, nor had an exit interview, with Oxford, Medvey did receive an unsigned form letter from MedSoft Corporation, dated November 11, 1999, describing her rights to a continuation of employee benefits under the federal COBRA statute. Plaintiff Ex. D, Medvey Dep. IV, 96-98; Ex. F, Def. Dep. Ex. 48.

– 18 –