UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICIA ANN MEDVEY,            :
          Plaintiff,            :
                                :
     v.                         :    NO. 3:01CV1977 (EBB)
                                :
OXFORD HEALTH PLANS, INC. and   :
METROPOLITAN LIFE INSURANCE     :
COMPANY,                        :
          Defendants.           :

RULING ON DEFENDANT OXFORD HEALTH PLAN, INC.'S AND DEFENDANT
METROPOLITAN LIFE INSURANCE'S MOTION FOR SUMMARY JUDGMENT

_____Plaintiff Patricia Medvey initially commenced an eleven-count

action in the Superior Court of the State of Connecticut, Judicial

District of Fairfield at Bridgeport, which action was removed to

this Court on October 19, 2001.  (Doc. No. 1).  In addition to

defendants Oxford Health Plans, Inc. ["Oxford"] and Metropolitan

Life Insurance Company ["MetLife"], the Complaint originally named

ten individual defendants who were employees of the corporate

defendants, all of whom were dismissed on May 7, 2002 by Senior

U.S. District Judge Warren W. Eginton ["May 2002 Ruling"].  (Doc.

No. 14).[1]  Plaintiff then filed her Amended Complaint on May 23,

2002, alleging seven counts against the remaining defendants Oxford

and MetLife: violation of the Employee Retirement Income Security

Act of 1974 ["ERISA"], 29 U.S.C. § 1001 et seq., 29 U.S.C. §

1132(a)(1)(B), and 29 U.S.C. § 1132(c) (Counts One & Two); civil

conspiracy in violation of the laws of the State of Connecticut

---

[1] The May 2002 Ruling also dismissed five state common law counts.  See note 8
infra.

(Count Three); disability discrimination under the Connecticut Fair Employment Practices Act ["CFEPA"], CONN. GEN. STAT. § 46a-51 et seq. (Count Four); failure to provide reasonable accommodation under the Americans with Disabilities Act ["ADA"], 42 U.S.C. §§ 12101-17 (Count Five); violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count Six); and retaliation in violation of state and federal law (Count Seven). (Doc. No. 15).

Defendants subsequently filed their Motion to Dismiss Counts One through Three of the Amended Complaint on June 18, 2002 (Docs. No. 17-18), which was granted in part with respect to Counts One and Two on February 6, 2003 by Judge Eginton, dismissing plaintiff's ERISA claims on the ground that plaintiff had failed to exhaust her administrative remedies, but denied with respect to Count Three on civil conspiracy. ["February 2003 Ruling"](Doc. No. 24). On April 3, 2003, defendants filed their Answers and affirmative defenses to plaintiff's Amended Complaint. (Docs. No. 26-27).

On September 18, 2003, defendants filed their Motion to Dismiss Count Three of the Amended Complaint. (Docs. No. 31-32). On February 11, 2004, this case was transferred to this Senior United States District Judge (Doc. No. 49) and on March 18, 2004, this Court granted defendant's Motion to Dismiss Count Three on the ground that "[r]egardless of whether plaintiff's conspiracy claim is meant to be a civil conspiracy claim pursuant to the laws of

Connecticut or a § 1985 claim," neither claim can survive as this claim is preempted by other statutory remedies asserted by plaintiff. ["March 2004 Ruling"](Doc. No. 51).

On September 15, 2004, defendant Oxford filed a Motion for Summary Judgment as to the remaining four counts (Counts Four through Seven), and its brief and Local Rule 56(a)1 Statement in Support. (Docs. No. 65-68).[2] Plaintiff filed her brief in opposition and Local Rule 56(a)2 Statement of Material Facts on November 24 and December 2, 2004 (Docs. No. 80, 83, 83-1),[3] as to which defendant Oxford filed its reply on March 16, 2005. (Doc. No. 91).

Also on September 15, 2004, defendant MetLife filed its Motion for Summary Judgment as to the remaining counts, and brief and

_____

[2] Attached to Doc. No. 67 are the following seventeen exhibits: excerpts from the deposition of Patricia Medvey, 3/18/04 ["Doc. No. 67, Medvey Depo. I"] (Exh. A); excerpts from the deposition of Patricia Medvey, 5/13/04 ["Doc. No. 67, Medvey Depo. II"] (Exh. B); excerpts from the deposition of Patricia Medvey, 5/18/04 ["Doc. No. 67, Medvey Depo. III"] (Exh. C); excerpts from the deposition of Patricia Medvey, 5/28/04 ["Doc. No. 67, Medvey Depo. IV"] (Exh. D); excerpts from the deposition of Patricia Medvey, 6/30/04 ["Doc. No. 67, Medvey Depo. V"] (Exh. E); copies of thirty-two exhibits marked by defendant at the Medvey Depositions ["Doc. No. 67, Depo. Exhs."] 1, 4, 5, 6, 7, 12, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 37, 38, 39, 46, 48, 51, 52, 53, 57, 58 (Exh. F); excerpts from the deposition of Amy Arnheim, 5/19/04 ["Arnheim Depo."] (Exh. G); affidavit of Pat Orsaia, sworn to August 27, 2004 ["Orsaia Aff't"] (Exh. H); affidavit of Kathy Marlor, sworn to August 5, 2004 ["Marlor Aff't"] (Exh. I) and copy of correspondence, dated July 5, and September 7, 2001 (Exhs. I-A - I-B); affidavit of Nancy Joy Wilsnack, sworn to July 27, 2004 ["Wilsnack Aff't"] (Exh. J); State of Connecticut Commission on Human Rights and Opportunities Complaint, dated March 13, 2000 (Exh. K); copy of affidavit of Jeanne Rudell, sworn to August 30, 2004 ["Rudell Aff't"] (Exh. L); and copies of case law (Exhs. M-Q).

[3] Attached to plaintiff's brief in opposition is her addendum of exhibits (Doc. No. 83-1) with the following nine exhibits: additional excerpts from Medvey Depos. I-V (Exhs. A-E); additional copies of defendant's Depo. Exhs. 1, 11, 12, 13, 15, 16, 18, 19, 20, 24, 26, 27, 28, 29, 30, 37, 39, 42, 48, 59, 60 (Exh. F); copies of plaintiff's Depo. Exhs. 3, 4, 18 (Exh. G); copy of the Orsaia Aff't (Exh. H); and another copy of the Rudell Aff't (Exh. I).

Local Rule 56(a)1 Statement in Support.   (Docs. No. 69-72).[4]
Plaintiff filed her brief in opposition to defendant MetLife's
Motion for Summary Judgment and her Local Rule 56(a)2 Statement on
November 24, 2004. (Docs. No. 79 & 81).[5]  Thereafter, defendant
MetLife filed its reply brief on March 14, 2005.  (Doc. No. 89).

     For the reasons stated below, defendant Oxford's Motion for
Summary Judgment (Doc. No. 65) is **granted** and defendant MetLife's
Motion for Summary Judgment (Doc. No. 69) is **granted**.

## I. FACTUAL BACKGROUND

### A. DEFENDANT OXFORD

     The following factual summary is based on defendant Oxford's
Local Rule 56(a)1 Statement of Material Facts, filed September 15,
2004 ["Defendant Oxford's Statement"] and accompanying affidavits,
depositions and exhibits, and Plaintiff's Local Rule 56(a)2
Statement of Material Facts, filed November 24, 2004 ["Plaintiff's
Statement"], and documents cited therein.   Consequently, such

---

[4] Attached to Doc. No. 71 are the following sixteen exhibits: additional
excerpts from the deposition of Patricia Medvey, 3/18/04 ["Doc. No. 71, Medvey
Depo. I"](Exh. A); additional excerpts from the deposition of Patricia Medvey,
5/13/04 ["Doc. No. 71, Medvey Depo. II"](Exh. B); additional excerpts from the
deposition of Patricia Medvey, 5/18/04 ["Doc. No. 71, Medvey Depo. III"](Exh.
C); additional excerpts from the deposition of Patricia Medvey, 5/28/04 ["Doc.
No. 71, Medvey Depo. IV"] (Exh. D); additional excerpts from the deposition of
Patricia Medvey, 6/30/04(Exh. E); copies of exhibits marked by defendant at
the Medvey depositions, ["Doc. No. 71, Depo. Exhs."] 26, 27, 29, 37, 38, 39,
46, 51, 52, 57 (Exh. F); original of the Rudell Aff't (Exh. G); and copies of
case law (Exhs. H-I).

[5] Attached to plaintiff's brief in opposition (separately collated) are the
following five exhibits: copy of additional excerpts from Medvey Depo. IV
(Exh. D); additional copies of defendant's deposition exhibits 18, 28, 37 & 42
(Exh. F); another copy of the Orsaia Aff't (Exh. H); and another copy of the
Rudell Aff't (Exh. I).

factual summary does not represent factual findings of the Court.

Plaintiff was involved in a car accident in June 1987, which she claims resulted in her alleged disability, a brain dysfunction frontal lobe injury and visual disturbance. (Defendant Oxford's Statement ¶¶ 1, 14; Plaintiff's Statement ¶¶ 1, 14; Doc. No. 67, Medvey Depo. III at 55). Between the time of the accident and October 1997, plaintiff worked five part-time jobs. (Defendant Oxford's Statement ¶ 2; Plaintiff's Statement ¶ 2; Doc. No. 67, Medvey Depo. III at 58-60).

Oxford hired plaintiff on October 27, 1997 as a Dedicated Service Manager ["DSM"] to receive telephone calls from Oxford members for issue resolution. (Defendant Oxford's Statement ¶¶ 4-5; Plaintiff's Statement ¶¶ 4-5; Doc. No. 67, Medvey Depo. I at 36; Doc. No. 67, Medvey Depo. II at 46-47). The DSM position required the use of multiple, scrolling computer screens to answer calls that came into a telephone call holding tank called a "cue" or "queue." (Defendant Oxford's Statement ¶¶ 6-7; Plaintiff's Statement ¶¶ 6-7; Doc. No. 67, Medvey Depo. I at 36; Doc. No. 67, Medvey Depo. II at 67). In her first assignment, plaintiff performed well as a Medicare phone representative. (Defendant Oxford's Statement ¶ 9; Plaintiff's Statement ¶ 9; Doc. No. 67, Medvey Depo. II at 51-53; Doc. No. 67, Depo. Exh. 15). In January 1998, plaintiff was assigned to the Medicare Group Accounts section, in which section she exceeded the standards of

productivity. (Defendant Oxford's Statement ¶¶ 10-11; Plaintiff's Statement ¶¶ 10-11; Doc. No. 67, Medvey Depo. I at 36-39; Doc. No. 67, Depo. Exh. 16 at 2).

On May 1, 1998, plaintiff became eligible for alimony from her ex-husband, Robert Medvey, pursuant to their divorce. (Defendant Oxford's Statement ¶ 12; Plaintiff's Statement ¶ 12; Doc. No. 67, Medvey Depo. III at 130-31; Doc. No. 67, Depo. Exh. 58 at 2). Days later, on May 6, 1998, Oxford received a note from plaintiff's ophthalmologist, Dr. Rabinowitz, which stated that "the use of multi-screens at work at fast pace is not appropriate for Pat [Medvey]." (Defendant Oxford's Statement ¶ 13; Plaintiff's Statement ¶ 13; Doc. No. 67, Medvey Depo. IV at 44-45; Doc. No. 67, Depo. Exh. 20). Plaintiff's supervisors, Laurie Willett and Mike Trumbley, told her that she was doing a good job and she should pace herself.[6] (Defendant Oxford's Statement ¶ 17; Plaintiff's Statement ¶ 17; Doc. No. 67, Medvey Depo. I at 40; Doc. No. 67, Medvey Depo. II at 30, 71). That same month, defendant Oxford assigned plaintiff to Oxford's Correspondence Initiative to accommodate her alleged disability, where plaintiff remained until August 1998, when the Correspondence Initiative was abandoned due to downsizing resulting from defendant Oxford's financial difficulties. (Defendant Oxford's Statement ¶¶ 18-21;

---

[6] Plaintiff regarded both Laurie Willett and Mike Trumbley as "advocates" who tried to help her. (Defendant Oxford's Statement ¶ 35; Plaintiff's Statement ¶ 35; Doc. No. 67, Medvey Depo. II at 57-58, 78-81; Doc. No. 67, Medvey Depo. IV at 20-21).

Plaintiff's Statement ¶¶ 18-21; Doc. No. 67, Medvey Depo. I at 40-42; Doc. No. 67, Medvey Depo. II at 57-58, 70, 72; Doc. No. 67, Medvey Depo. IV at 50-51; Orsaia Aff't ¶¶ 7-8).[7]  Plaintiff then returned to the DSM position with a smaller cue in the Medicare Group Accounts section.  (Defendant Oxford's Statement ¶ 22; Plaintiff's Statement ¶ 22; Doc. No. 83 at 5; Doc. No. 66 at 2; Doc. No. 67, Medvey Depo. III at 159-60).

On August 25, 1998, plaintiff sent an e-mail reminding her supervisor of Dr. Rabinowitz's note and that laboring under the essential functions of her position contravened his advice. (Defendant Oxford's Statement ¶ 23; Plaintiff's Statement ¶ 23; Doc. No. 67, Depo. Exh. 18; see Doc. No. 67, Medvey Depo. II at 67).  Shortly thereafter, the Medicare Group Accounts department moved to New Hampshire and, instead of opting for severance, plaintiff remained with Oxford, applying for a position as a Dedicated Group Service Associate ["DGSA"] on September 17, 1998. (Defendant Oxford's Statement ¶¶ 25-26, 28; Plaintiff's Statement ¶¶ 25-26, 28; Doc. No. 67, Medvey Depo. II at 69; Doc. No. 67, Medvey Depo. III at 159-160; Doc. No. 67, Depo. Exh. 19). Plaintiff began work as a DGSA in October 1998 and was evaluated as "Fully Performing Requirements" as a DGSA on March 10, 1999.

---

[7] Oxford was having financial difficulties that resulted in reductions in force, limited hiring and hiring freezes that began around the time plaintiff was hired and continued throughout her employment at Oxford.  (Defendant Oxford's Statement ¶¶ 20-21; Plaintiff's Statement ¶¶ 20-21; Doc. No. 67, Medvey Depo. IV at 50-51; Orsaia Aff't ¶¶ 9, 11; Marlor Aff't ¶¶ 7-8).

(Defendant Oxford's Statement ¶¶ 31-32; Plaintiff's Statement ¶¶ 31-32; Doc. No. 67, Medvey Depo. II at 78-81; Doc. No. 67, Depo. Exh. 24 at 2).

On May 19, 1999, plaintiff applied for, and was granted, a medical leave of absence from May 22 to June 13, 1999. (Defendant Oxford's Statement ¶ 38; Plaintiff's Statement ¶ 38; Doc. No. 67, Medvey Depo. II at 83-84; Doc. No. 67, Depo. Exhs. 26, 29). Plaintiff's psychiatrist, Dr. Harry Brown, provided a note for the medical leave, stating that the reason for the leave of absence was "[d]ifficulty concentrat[ing] and organization work related demands. Eye strain, dizziness, and nausea, resulting in temporary decreased performance." (Defendant Oxford's Statement ¶ 39; Plaintiff's Statement ¶ 39; Doc. No. 67, Medvey Depo. II at 84-85; Doc. No. 67, Depo. Exh. 27). While she was on medical leave, plaintiff moved her residence from Stratford to Greenville Hunt. (Defendant Oxford's Statement ¶ 40; Plaintiff's Statement ¶ 40; Doc. No. 67, Medvey Depo. III at 84).

Plaintiff's leave was later extended from June 14 to June 27, 1999 and she returned to work on June 28, with a note from Dr. Brown advising that she have limited exposure to computer work. (Defendant Oxford's Statement ¶¶ 41, 43-44; Plaintiff's Statement ¶¶ 41, 43-44; Doc. No. 67, Depo. Exhs. 28, 30-31; Doc. No. 67, Medvey Depo. II at 88-93). This restriction was not mentioned by Dr. Brown in his June 1 report or at any time previously.

(Defendant Oxford's Statement ¶ 45; Plaintiff's Statement ¶ 45; Doc. No. 67, Depo. Exh. 28 at 1-5). Plaintiff was given temporary work to perform in accordance with her doctor's request, but soon returned to medical leave in part because of her doctor's limitations and because defendant Oxford's downsizing left no suitable alternative positions available. (Defendant Oxford's Statement ¶¶ 47, 50-52; Plaintiff's Statement ¶¶ 47, 50-52; Orsaia Aff't ¶¶ 8-10). During that time, Pat Orsaia, an Oxford Human Resource Manager, contacted MetLife, the claims administrator and insurer for Oxford's disability program, to discuss plaintiff's status. (Defendant Oxford's Statement ¶¶ 48-49; Plaintiff's Statement ¶¶ 48-49; Orsaia Aff't ¶ 8; Rudell Aff't ¶¶ 5-6). Defendant Oxford could not find an alternate position for plaintiff for several months. (Defendant Oxford's Statement ¶ 54; Plaintiff's Statement ¶ 54; Orsaia Aff't ¶ 11). On August 18, 1999, Dr. Robert Lesser, a neuro-ophthalmologist, wrote that plaintiff should "switch her job to something that does not involve as much work with a computer screen." (Defendant Oxford's Statement ¶ 57; Plaintiff's Statement ¶ 57; Doc. No. 67, Medvey Depo. IV at 75; Doc. No. 67, Depo. Exh. 37 at 3). Plaintiff's last annual salary at Oxford was $28,166. (Defendant Oxford's Statement ¶ 58; Plaintiff's Statement ¶ 58; Marlor Aff't ¶ 10).

In July 1999, while on leave, plaintiff applied for a position with Coldwell Banker in Fairfield, Connecticut; plaintiff worked as

a personal assistant to Mila Grieb ["Grieb"], a Coldwell Banker real estate agent. (Defendant Oxford's Statement ¶¶ 55-56; Plaintiff's Statement ¶¶ 55-56; Doc. No. 67, Medvey Depo. III at 117-118, 129-130; Doc. No. 67, Depo. Exhs. 52, 57). On September 15, 1999, plaintiff signed a written employment agreement with Grieb for a commitment of six months at an annual salary of $25,000. (Defendant Oxford's Statement ¶¶ 59-60; Plaintiff's Statement ¶¶ 59-60; Doc. No. 67, Medvey Depo. III at 110-112; Doc. No. 67, Depo. Exhs. 51-53).

On August 31, 1999, MetLife mailed plaintiff a "Personal Profile" to complete so that MetLife could evaluate her condition. (Defendant Oxford's Statement ¶ 81; Plaintiff's Statement ¶ 81; Doc. No. 67, Medvey Depo. II at 104-05; Doc. No. 67, Depo. Exh. 38). On September 20, 1999, plaintiff signed the completed Personal Profile in which she stated that she performed various types of housework; there had been no changes in her ability to care for her household since the onset of her disability; there had been no changes in her shopping habits; she participated in various leisure activities; and she had not changed her eating habits nor did she require assistance in preparing her meals. (Defendant Oxford's Statement ¶ 82; Plaintiff's Statement ¶ 82; Doc. No. 67, Medvey Depo. II at 108; Doc. No. 67, Depo. Exh. 39 at 1-5). MetLife closed its rehabilitation file on plaintiff on October 22, 1999. (Defendant Oxford's Statement ¶ 61; Plaintiff's Statement ¶

10

61; Doc. No. 67, Depo. Exh. 46; Doc. No. 67, Medvey Depo. III at 34-36). Plaintiff did not appeal that decision until November 28, 2001. (Defendant Oxford's Statement ¶ 62; Plaintiff's Statement ¶ 62; See February 2003 Ruling).[8] Plaintiff applied for and received COBRA benefits for the full eighteen months that they were available. (Defendant Oxford's Statement ¶ 65; Plaintiff's Statement ¶ 65; Doc. No. 67, Medvey Depo. III at 47; Doc. No. 67, Depo. Exh. 48).

Plaintiff continued working for Grieb until May 15, 2000, and then began working for Grieb's daughter, Nancy Joy Wilsnack ["Wilsnack"], who was also a real estate agent. (Defendant Oxford's Statement ¶ 66; Plaintiff's Statement ¶ 66; Wilsnack Aff't ¶¶ 4, 8, 10). Plaintiff retained her position with Wilsnack from May 16, 2000 through December 31, 2001 at an annual salary of $30,000, plus a bonus. (Defendant Oxford's Statement ¶ 67; Plaintiff's Statement ¶ 67; Wilsnack Aff't ¶¶ 4, 8-12). Plaintiff's real estate work required the use of computers. (Defendant Oxford's Statement ¶ 72; Plaintiff's Statement ¶ 72; Doc. No. 67, Medvey Depo. III at 72). During this time, plaintiff was happy in her job, particularly because she did not have to work nights or weekends. (Defendant Oxford's Statement ¶ 68; Plaintiff's

---

[8] In the February 2003 Ruling, Judge Eginton ruled that plaintiff's common law claims were preempted by ERISA and dismissed such claims on grounds that plaintiff had failed to exhaust her administrative remedies. (Defendant Oxford's Statement ¶¶ 63-64; Plaintiff's Statement ¶¶ 63-64). See note 1 supra.

Statement ¶ 68; Wilsnack Aff't ¶ 15). She exhibited no emotional distress over the loss of her position at Oxford and never discussed her disability claim with Wilsnack. (Defendant Oxford's Statement ¶¶ 68-69; Plaintiff's Statement ¶¶ 68-69; Wilsnack Aff't ¶¶ 15-16).

Also in 2001, Oxford interviewed plaintiff for several available positions and offered her a part-time job, which plaintiff rejected. (Defendant Oxford's Statement ¶ 99; Plaintiff's Statement ¶ 99; Marlor Aff't ¶¶ 11-17). Oxford additionally wrote plaintiff two letters inviting plaintiff for further interviews, to which plaintiff declined to respond. (Id.).

From December 2001 through December 1, 2003, plaintiff worked as a real estate agent for Coldwell Banker in Westport under the management of Amy Arnheim ["Arnheim"]; plaintiff was ultimately asked to leave because of a lack of productivity. (Defendant Oxford's Statement ¶¶ 73-74, 76; Plaintiff's Statement ¶¶ 73-74, 76; Arnheim Depo. at 4-5, 17, 46-48, 53). Grieb, Wilsnack and Arnheim all stated that plaintiff wanted to limit the amount she earned since leaving Oxford because she did not want her alimony reduced. (Defendant Oxford's Statement ¶ 78; Plaintiff's Statement ¶ 78; Doc. No. 67, Depo. Exh. 53 at 1; Wilsnack Aff't ¶ 17; Arnheim Depo. at 78).

Since leaving Oxford, plaintiff has taken several vacations, traveling to Florida, the Bahamas and Vermont. (Defendant Oxford's

Statement ¶ 89; Plaintiff's Statement ¶ 89; Doc. No. 67, Medvey
Depo. V at 23-26).  Dr. Robert Lesser wrote in his report that
plaintiff's reading skills were excellent and, on plaintiff's 1997
resume, she listed golf, tennis and skiing as activities in which
she participated.  (Defendant Oxford's Statement ¶¶ 85, 87;
Plaintiff's Statement ¶¶ 85, 87; Doc. No. 67, Medvey Depo. II at
100-01, 106-07; Doc. No. 67, Depo. Exhs. 12, 37).   Plaintiff
claims that her symptoms may also result from stressful personal
situations and can often be alleviated by a small dose of Valium.
(Defendant Oxford's Statement ¶¶ 91-94, 98; Plaintiff's Statement
¶¶ 91-94, 98; Doc. No. 67, Medvey Depo. II at 111; Doc. No. 67,
Medvey Depo. III at 12-14, 16-17).

    B. DEFENDANT METLIFE

    As stated above, the following factual summary is based on
defendant MetLife's Local Rule 56(a)1 Statement of Facts, filed
September 15, 2004 ["Defendant MetLife's Statement"] and
accompanying affidavits, depositions and exhibits, and Plaintiff's
Local Rule 56(a)2 Statement of Facts, filed November 24, 2004
["Plaintiff's Statement"], and documents cited therein.
Consequently, this factual summary does not represent factual
findings of the Court.  As stated above, plaintiff began working
for Oxford on October 27, 1997. (Defendant MetLife's Statement ¶ 1;
Plaintiff's Statement ¶ 1; Doc. No. 71, Medvey Depo. II at 46-47).
During her employ, plaintiff participated in an employee welfare

13

benefit plan ["Plan"], which was sponsored by Oxford and was funded by a group policy of insurance issued by MetLife to Oxford. (Defendant MetLife's Statement ¶ 2; Plaintiff's Statement ¶ 2; Rudell Aff't, ¶¶ 5-6). MetLife is the claims administrator of the Plan, which is governed by ERISA. (Id.).

Plaintiff initiated a claim with defendant MetLife in May 1999, supporting that claim with a note from her psychiatrist, Dr. Harry Brown, which explained that plaintiff had: "[d]ifficulty concentrat[ing] and organization work related demands. Eye strain, dizziness, and nausea, resulting in temporary decreased performance." (Defendant MetLife's Statement ¶ 5; Plaintiff's Statement ¶ 5; Doc. No. 71, Depo. Exh. 27; Doc. No. 71, Medvey Depo. II at 84-85). Medvey applied for and was granted short term disability benefits under the plan from May 22, 1999 to June 13, 1999. (Doc. No. 71, Depo. Exhs. 26, 29; Doc. No. 71, Medvey Depo. II at 83-84).

In July 1999, plaintiff applied for a position with Coldwell Banker in Fairfield, Connecticut and began working as Grieb's personal assistant. (Defendant MetLife's Statement ¶¶ 6-7; Plaintiff's Statement ¶¶ 6-7; Doc. No. 71, Depo. Exhs. 52, 57; Doc. No. 71, Medvey Depo. III at 117-118, 129-130).

On August 18, 1999, Dr. Robert Lesser, a neuro-ophthalmologist, wrote that plaintiff "should switch her job to something that does not involve as much work with a computer

screen." (Defendant MetLife's Statement ¶ 8; Plaintiff's Statement ¶ 8; Doc. No. 71, Depo. Exh. 37 at 2; Doc. No. 71, Medvey Depo. IV at 75). On August 31, 1999, defendant mailed plaintiff a "Personal Profile" to complete so that defendant could evaluate plaintiff's condition. (Defendant MetLife's Statement ¶ 9; Plaintiff's Statement ¶ 9; Doc. No. 71, Depo. Exh. 38; Doc. No. 71, Medvey Depo. II 104-05). On September 20, 1999, plaintiff signed the completed Personal Profile, in which she stated that (1) she performed various types of housework, including laundry, vacuuming, dusting, and washing dishes; (2) there had been no changes in her ability to care for her household since her disability began; (3) there had been no changes in her shopping habits; (4) she participated in the activities of exercising, walking, movies, swimming, reading, television, personal use of the computer, and bridge; and (5) she had not changed her eating habits nor did she require assistance preparing her meals. (Doc. No. 71, Depo. Exh. 39 at 2-5; Doc. No. 71; Medvey Depo. II at 108).

On September 15, 1999, plaintiff signed an employment agreement to continue serving as Grieb's personal assistant for a period of six months. (Defendant MetLife's Statement ¶ 13; Plaintiff's Statement ¶ 13; Doc. No. 71, Depo. Exhs. 51, 52; Doc. No. 71, Medvey Depo. III at 110-112). Thereafter, defendant MetLife terminated plaintiff's benefits on October 22, 1999. (Defendant MetLife's Statement ¶ 15; Plaintiff's Statement ¶ 15; Doc. No. 71,

Depo. Exh. 46; Doc. No. 71, Medvey Depo. III at 34-36).  Plaintiff
did not appeal this decision until November 28, 2001, more than two
years after the benefits had terminated and well beyond the sixty-
day period to file an appeal.  (Defendant MetLife's Statement ¶ 15;
Plaintiff's Statement ¶ 15; <u>see</u> February 2003 Ruling).

II. STANDARD OF REVIEW

     The standard for summary judgment is well established.  The
moving party is entitled to summary judgment if it demonstrates
that there is no genuine issue of material fact and that it is
entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).
Upon motion, following adequate time for discovery, Rule 56(c)
requires that summary judgment be entered against a party

> who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case,
> and on which that party will bear the burden of proof at
> trial.  In such a situation, there can be "no genuine
> issue as to any material fact," since a complete failure
> of proof concerning an essential element of the nonmoving
> party's case necessarily renders all other facts
> immaterial.  The moving party is "entitled to judgment as
> a matter of law" because the nonmoving party has failed
> to make a sufficient showing on an essential element of
> her case with respect to which she has the burden of
> proof.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

     This showing may be made by "pleadings, depositions, answers
to interrogatories, and admissions on file, together with
affidavits, if any."  FED. R. CIV. P. 56(c).  Rule 56(e) specifically
provides that a party opposing summary judgment, however, "may not
rest upon mere allegations or denials of his pleading, but must set

16

forth specific facts showing that there is a genuine issue for trial." Id. at 256. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255 (citation omitted). "On summary judgment the inferences to be drawn from the underlying facts contained in the [moving party's] materials must be viewed in the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970) quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (citations and internal quotation marks omitted). Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact." Adickes, 398 U.S. at 153 (1970).

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted).

A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

### III. DISCUSSION

#### A. DEFENDANT OXFORD

According to defendant Oxford, summary judgment is proper because plaintiff's alleged disability is a condition involving vertigo and anxiety brought on by the use of multiple moving computer screens (Doc. No. 66 at 13-14); plaintiff was not disabled within the meaning of the ADA or the Rehabilitation Act because she was not substantially limited in one or more of her major life activities (id. at 14-19); plaintiff was not a qualified individual with a disability because she could not perform the essential functions of the job with or without reasonable accommodation (id. at 19-21); defendant did what was possible, in the face of its financial difficulties, to accommodate plaintiff's alleged disability (id. at 21-22); plaintiff did not suffer an adverse employment action (id. at 22); defendant did not discharge plaintiff because of any disability and plaintiff did not suffer from a chronic handicap, infirmity or impairment as required by CONN. GEN. STAT. § 46a-60(a)(1) (id. at 22-29); and plaintiff did not engage in any protected activity, and there was no adverse employment action taken against plaintiff. (Id. at 30-32).

18

### 1. COUNTS FIVE AND SIX: FAILURE TO PROVIDE A REASONABLE ACCOMMODATION UNDER THE ADA AND VIOLATION OF THE REHABILITATION ACT

Defendant Oxford contends that plaintiff was not disabled as required by the ADA or the Rehabilitation Act[9] because plaintiff was not substantially limited in any major life activity; plaintiff did not need reasonable accommodations to continue working; defendant Oxford did what was possible to accommodate plaintiff's disability; and plaintiff did not suffer an adverse employment action because of her disability. (Doc. No. 66 at 13-22; Doc. No. 91 at 3-8). Plaintiff responds that she has stated a prima facie case with respect to each prong of the discrimination analysis under the ADA and the Rehabilitation Act. (Doc. No. 83 at 21-25). Plaintiff further asserts that her disability involves both mental and physical impairments that substantially limit her major life activities of caring for herself, performing manual labor and working. (Id. at 25-26). Plaintiff also contends that she could perform the essential functions of her job with or without accommodation and defendant Oxford's actions in response to plaintiff's disability amount to an adverse employment action. (Id. at 26-31).

---

[9] The elements of a prima facie case under the Rehabilitation Act are identical to the elements of a claim under the ADA. Cino v. Sikorsky Aircraft, 42 F. Supp. 2d 147, 150 n. 1 (D. Conn. 1998)(citation omitted), aff'd, 182 F.3d 898 (2d Cir. 1999). The ADA and the Rehabilitation Act can be used interchangeably. Id. (multiple citations omitted). Accordingly, the following conclusions apply to Counts Five and Six.

"No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees. . . ."  42 U.S.C. § 12112(a).  To establish a prima facie claim of discriminatory discharge under the ADA, plaintiff must show (1) that defendant Oxford is subject to the ADA; (2) that plaintiff suffers from a disability within the meaning of the ADA; (3) that plaintiff could perform the essential functions of her job with or without reasonable accommodation; and (4) that plaintiff suffered an adverse employment action because of her disability.  See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998).

### a. DEFENDANT OXFORD IS SUBJECT TO THE ADA

Defendant Oxford is an "employer" subject to terms and conditions of the ADA.  29 C.F.R. § 1630.2(e); see 42 U.S.C. § 12111(5)(A); (see generally Doc. No. 66, 14-15; Doc. No. 83 at 21).  Thus, the first prong of plaintiff's prima facie case is satisfied.

### b. THE EXISTENCE OF A DISABILITY AND SUBSTANTIAL LIMITATIONS ON MAJOR LIFE ACTIVITIES

To establish the second prong of her prima facie case, plaintiff must establish that "a physical or mental impairment . . . substantially limits one or more of [her] major life activities."  42 U.S.C. § 12102(2)(A).[10]  Determining whether

---

[10] Plaintiff can also demonstrate that she is disabled if she has "a record" of a substantially limiting impairment or she is "regarded as having such an impairment" by her employer.  42 U.S.C. § 12102(2)(B)-(C); see also Shaw v.

plaintiff has such a disability requires analysis of a three-step process set forth by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  First, it must be determined whether plaintiff has a physical or mental impairment.  Id. at 631.  Next, the court must decide whether the life activity upon which plaintiff relies is actually a major life activity under the ADA. Id.  Finally, the court must analyze whether the impairment is a substantial limitation on the major life activity.  Id.

Plaintiff suffers neurological limitations as a result of her 1987 car accident, including "symptoms of Post Traumatic Shock Syndrome," "Traumatic Brain Injury," "brain dysfunction frontal lobe injury and visual disturbance." (Doc. No. 66 at 3, 13-14; Doc. No. 83 at 22; Doc. No. 83-1, Plaintiff Depo. Exh. 4; see Doc. No. 67, Depo. Exh. 39).[11]  According to defendant, however, plaintiff's condition has caused her "no or minimal difficulty caring for herself, performing manual tasks, walking, hearing, speaking, breathing or learning." (Doc. No. 66 at 15; Doc. No. 91 at 3-4).  Plaintiff counters that all of plaintiff's activities have been affected in some way by her disability.  (Doc. No. 83 at

---

Greenwich Anesthesiology Assocs., 137 F. Supp. 2d 48, 54 (D. Conn. 2001). Neither alternative is at issue in the present case.

[11] In a letter, dated February 18, 2004, authored by Dr. Harry J. Brown, Dr. Brown also states that "[t]he accident of June 17, 1987, left [plaintiff] with a 15% physical disability from herniated discs in her neck and soft tissue injury." (Doc. No. 83-1, Plaintiff Depo. Exh. 4).  Defendant correctly contends that plaintiff's claim that she has a physical disability from herniated disks injects new facts into the case that were never shared with Oxford. (Doc. No. 91 at 3).  Accordingly, the Court will not consider this evidence of plaintiff's disability.

23).

A "major" activity is one that is of "central importance to
most people's daily lives." Toyota Motor Mfg., Kentucky, Inc. v.
Williams, 534 U.S. 184, 195, 198 (2002).  Major life activities
include "functions such as caring for oneself, performing manual
tasks, walking, seeing, hearing, speaking, breathing, learning, and
working."  29 C.F.R. § 1630.2(i) (2001).[12]  Plaintiff observes that
she has difficulty (1) "caring for herself - she has required the
assistance of a housekeeper"; (2) "performing manual tasks - she
has bouts where her seeing and hearing are diminished"; and (3)
"working - she requires accommodation for the disability and when
not directly available, she self accommodates in ways that are not
necessarily evident." (Doc. No. 83 at 23-24).  Plaintiff admits,
however, that since leaving Oxford, she has traveled to Florida,
the Bahamas and Vermont, performs various types of housework, has
not changed her ability to care for her household or her shopping
habits, and has participated in exercising, walking, movies,
swimming, reading, watching television, using a personal computer
and playing bridge.  (Doc. No. 66 at 10, 15-16; Defendant Oxford's
Statement ¶¶ 85, 87, 89; Plaintiff's Statement ¶¶ 85, 87, 89; Doc.
No. 67, Medvey Depo. V at 23-26; Doc. No. 67, Medvey Depo. II at
106-07, 116-118, 121; Doc. No. 67, Depo. Exhs. 12, 39).  Weighing

---

[12] "The Court accords "great deference" to the EEOC's interpretation of the
ADA."   See Francis v. City of Meriden, 129 F.3d 281, 283 n.1 (2d Cir.
1997)(citation omitted).

plaintiff's evidence in the light most favorable to her, the issue becomes whether plaintiff has met her initial burden to show that her alleged impairment substantially limits her ability to engage in those major life activities.

Under the EEOC Regulations, the term "substantially limited" means:

> [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i)-(ii) (2001). "'Substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" <u>Toyota</u>, 534 U.S. at 196. Individuals claiming a substantial limitation must prove their disability "by offering evidence that the extent of the limitation in terms of their own experience . . . is substantial." <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S. 555, 567 (1999).

Plaintiff contends that she has required the use of a housekeeper; however, plaintiff routinely completes housework, including laundry, vacuuming, dusting and washing dishes, "when necessary." (Doc. No. 83-1, Medvey Depo. I at 29-30; Doc. No. 67, Depo. Exh. 39). Accordingly, plaintiff's impairment does not limit her ability to care for herself.

23

Plaintiff generally asserted at her depositions that she has problems walking, hearing, learning, lifting and working as a result of her traumatic brain injury. (Doc. No. 83-1, Medvey Depo. IV at 6-7). Additionally, she claims that she suffers from reduced concentration and memory, difficulty retrieving words, increased anxiety, and bouts with impulsiveness and depression. (Id. at 7-9). Plaintiff also claims that she is limited in her ability to drive or be a passenger in an automobile. (Doc. No. 67, Medvey Depo. II at 116-17).

"When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." Toyota, 534 U.S. at 200-01. Driving is undeniably a task "central to most people's daily lives." Id. However, although plaintiff claims that she is limited in her ability to drive, she admits that she has been able to drive between approximately 11,000 and 15,000 miles per year for business and, in fact, has traveled to Florida, the Bahamas and Vermont since leaving Oxford, while actively exercising, walking, skiing, and swimming. (Doc. No. 67, Medvey Depo. II at 116-17; Doc. No. 67, Medvey Depo. III at 142-143; Doc. No. 67, Depo. Exhs. 4-7, 39; Doc. No. 67, Medvey Depo. V at 23-26). Accordingly, plaintiff is not substantially limited in her ability to perform

manual tasks that are central to most people's daily lives.

Plaintiff primarily asserts that her impairment substantially affects her ability to work. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that [plaintiff] allege[s] [that she is] unable to work in a broad class of jobs." See Sutton v. United Airlines, Inc., 527 U.S. 471, 491 (1999). "To be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." Id. at 492. Accordingly, "[w]ith respect to the major life activity of working", the EEOC has defined "substantially limited" as

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

A critical factor cited by the EEOC is "the number and types of jobs utilizing similar training, knowledge, skills or abilities [within the geographical area to which the individual has reasonable access], from which the individual is also disqualified. . . ." 29 C.F.R. §§ 1630.2(j)(3)(ii)(A)-(B). "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs."

25

Sutton, 527 U.S. at 492.

Approximately seven months after plaintiff was hired by Oxford in a DSM position, plaintiff gave defendant Oxford a note from her ophthalmologist that stated that "the use of multi-screens at work at fast pace is not appropriate for Pat [Medvey]." (Defendant Oxford's Statement ¶ 13; Plaintiff's Statement ¶ 13; Doc. No. 67, Medvey Depo. IV at 44-45; Doc. No. 67, Depo. Exh. 20). In response, defendant Oxford moved plaintiff to a more suitable position for a few months, but moved her back to the DSM position following a downsize. (Doc. No. 67, Medvey Depo. II at 57-58; Doc. No. 67, Medvey Depo. I at 40-42). Plaintiff voiced her complaint on August 25, 1998 and then was placed in a DGSA position, in which she worked from October 1998 through May 1999. (Id.; Doc. No. 67, Medvey Depo. III at 159-160). On May 19, 1999, plaintiff applied for, and received, a medical leave of absence for three weeks, which was later extended at plaintiff's request for an additional two weeks. (See Doc. No. 67, Depo. Exhs. 26, 29-30; Doc. No. 67, Medvey Depo. II at 83-84, 88-89). During her leave of absence, plaintiff worked for another employer, real estate agent Grieb. (Doc. No. 67, Depo. Exhs. 52, 57; Doc. No. 67, Medvey Depo. III at 117-118, 129-130). In the months following plaintiff's return to Oxford from her leave of absence, Oxford was unable to provide plaintiff with an accommodating position, so plaintiff returned to medical leave. (Orsaia Aff't ¶¶ 9-10).

26

On September 15, 1999, plaintiff signed an employment agreement to serve as Grieb's personal assistant, for whom plaintiff worked until May 15, 2000. (Doc. No. 67, Depo. Exh. 51; Doc. No. 67, Medvey Depo. III at 110-112; Wilsnack Aff't ¶¶ 4, 8-11). The very next day, plaintiff began working in the same capacity for Grieb's daughter, Wilsnack. (Wilsnack Aff't ¶ 4, 8-12). Plaintiff contends that she suffers from the chronic effects of a traumatic brain injury that "limit[s] her ability to use a computer in a competitive, profit making, business paced environment, no matter the employer, nor the job position."[13] (Doc. No. 83 at 25). The personal assistant position for both Grieb and Wilsnack required the use of a computer, specifically a program that maintained and organized housing inventory listings and price ranges. (Doc. No. 67, Medvey Depo. III at 72-73). According to plaintiff, she did not suffer the same problem she had at Oxford, but, if she was at the computer for a long period of time, she would need to make adjustments. (Id.). Plaintiff, however, never discussed with Wilsnack any claim that she was disabled. (Wilsnack Aff't ¶¶ 15-16). Moreover, she never requested any accommodation for her disability from either Grieb or Wilsnack, though plaintiff

---

[13] Plaintiff further acknowledges that she is "unable to perform . . . in the realm of moving multi-screened computer programs -- not just any computer system operation. While this precludes [plaintiff] from certain classes of employment and positions at all employers, it does not preclude her from other employment positions at any employer." (Doc. No. 83 at 25). As stated above, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs"; plaintiff admits she is not so precluded. Sutton, 527 U.S. at 491.

admitted that the position resulted in enough discomfort to require periodic adjustments. (Id.; Doc. No. 67, Medvey Depo. III at 72-73). On January 1, 2002, plaintiff began working for Coldwell Banker as a real estate agent -- a job she held for two years, during which time she never discussed her alleged disability with her employers. (Doc. No. 67, Medvey Depo. III at 85; Arnheim Depo. at 77).

The foregoing evidence does not indicate that plaintiff's major life activity of working was "substantially limited" for the purposes of the ADA or the Rehabilitation Act. While working for defendant Oxford, plaintiff made only two noted complaints prior to her medical leave, and both came about while she was a DSM. Plaintiff was only in the DGSA role from October 1998 through May 19, 1999, when she applied for medical leave. (Doc. No. 67, Medvey Depo. II at 78-81, 83-84; Doc. No. 67, Depo. Exhs. 26, 29). Plaintiff had little difficulty adjusting to the personal assistant position she acquired while on medical leave, a job which required the use of computers. (Doc. No. 67, Medvey Depo. III at 72). Though plaintiff found it necessary to make adjustments after working with the computers for a period of time, her discomfort never resulted in any complaints to her superiors. (Wilsnack Aff't ¶¶ 15-16). Plaintiff is not precluded from working a broad range of jobs that include computers, but rather her condition affects her ability to perform a specific job, one involving multiple

moving screens while responding to numerous, continuous telephone calls.[14]

Plaintiff's tenure as a personal assistant and then as a real estate agent highlights that plaintiff is not precluded from a substantial class of jobs. See Sutton, 527 U.S. at 492. In fact, plaintiff concedes that she has successfully performed "a variety of jobs, over the course of her working years, which require the use of a computer, including positions at Oxford." (Doc. No. 83 at 27). However, plaintiff is precluded from working with multiple moving computer screens. The inability to perform one particular job is insufficient as a matter of law to prove plaintiff is substantially limited in the major life activity of working. Murphy v. United Parcel Service, Inc., 527 U.S. 516, 523 (1999). Plaintiff fails to meet her prima facie requirements of the third prong of the Bragdon test, and fails to establish that her physical or mental impairment substantially limits one or more of her major life activities. See 42 U.S.C. § 12102(2)(A); Reeves, 140 F.3d at 149-50.

c. QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS
OF HER JOB WITH OR WITHOUT ACCOMMODATION

Even assuming, arguendo, that plaintiff has established that

---

[14] Additionally, plaintiff's testimony establishes that her condition is symptomatic when working on multiple moving computer screens but intermittent and episodic when faced with certain stressful situations. (See Doc. No. 67, Medvey Depo. II at 114; Doc. No. 67, Medvey Depo. III at 12-13). Such intermittent, episodic impairments are not considered disabilities. Hernandez v. City of Hartford, 959 F. Supp. 125, 131 (D. Conn. 1997)(citation omitted).

she is substantially limited by her impairments in one or more
major life activities, plaintiff must satisfy her burden to show
that she could perform the essential functions of her job with or
without reasonable accommodation.  To be qualified to perform the
job at issue, plaintiff "must satisfy the requisite skill,
experience, education and other job-related requirements of the
employment position and must be able to perform the essential
functions of the position, with or without reasonable
accommodation."  Misek-Falkoff v. International Business Machines
Corp., 854 F. Supp. 215, 226 (S.D.N.Y. 1994) (multiple citations
omitted), aff'd, 60 F.3d 811 (2d Cir. 1995).

While at Oxford, plaintiff first worked as a Medicare phone
representative and, in January 1998, she was assigned to the
Medicare Group Accounts section, which had a smaller call queue.
(Doc. No. 83 at 5; Doc. No. 66 at 2).  In May 1998, as an
accommodation after the receipt of a note from Dr. Rabinowitz,
plaintiff was assigned to Oxford's Correspondence Initiative in the
Issues and Resolutions Department, but, as a result of downsizing
within the company, plaintiff returned to her DSM work in the
Medicare Group Accounts section.  (Doc. No. 83 at 6-7; Doc. No. 66
at 3-4). When the Medicare Group Accounts section was transferred
to New Hampshire a few weeks later, plaintiff was offered a
position in the Claims Department, a position as a DGSA, or a
severance package.  (Doc. No. 83 at 7; Doc. No. 66 at 4).

Plaintiff applied for the DGSA position without requesting an accommodation and began to work as a DGSA in October 1998 until her medical leave of absence on May 22, 1999. (Doc. No. 83 at 8-9; Doc. No. 66 at 5-6). Plaintiff performed well and received favorable performance evaluations for her work at Oxford. (Doc. No. 67, Medvey Depo. II at 51-53; Doc. No. 83-1, Medvey Depo. II at 51-53, 55, Depo. Exh. 15 at 2; Depo. Exh. 16 at 2; see also Doc. No. 67, Depo. Exh. 15 at 2; Depo. Exh. 16 at 2). However, according to plaintiff, "her achievement came with great difficulty and with the assistance of medication." (Doc. No. 83 at 5; Doc. No. 83-1, Medvey Depo. II at 58-59, 67).

Plaintiff was aware that the essential functions of her job included "the use of multiple screens at a fast pace while answering a large volume of customer calls." (Doc. No. 67, Depo. Exh. 18). Moreover, at her deposition, plaintiff confirmed that the use of multiple screens at a consistently fast pace was an essential function to her position as a DSM. (Doc. No. 67, Medvey Depo. II at 67). When a person with a disability is unable to perform the essential functions of the job, the court must consider whether any reasonable accommodation by the employer would enable the person to perform those functions. School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 n.17 (1987) (citation omitted). Moreover, it is "plaintiff's burden to identify available positions and to demonstrate that she was qualified for

31

those positions." <u>Lester v. Natsios</u>, 290 F. Supp. 2d 11, 25 (D.D.C. 2003).

Once plaintiff presented defendant Oxford with her doctor's note advising that she not work with multiple screens, defendant Oxford accommodated plaintiff by assigning her to Oxford's Correspondence Initiative.[15]  (Doc. No. 67, Medvey Depo. II at 57-58, Doc. No. 67, Medvey Depo. I at 40-41).  After the Initiative was eliminated, plaintiff returned to the DSM position with a smaller cue.  (Doc. No. 83 at 5; Doc. No. 66 at 2; Doc. No. 67, Medvey Depo. III 159-60; <u>see</u> Doc. No. 67, Depo. Exh. 18).  After that position was eliminated, plaintiff was offered a position in the Claims Department, which she rejected, and a position as a DGSA, which plaintiff applied for and at which she worked until the time of her medical leave in May 1999. (Doc. No. 67, Medvey Depo. III at 159-60; Doc. No. 67, Medvey Depo. II at 69, 78-81, 83-84).   When plaintiff returned to work on June 28, 1999, she had a note from her psychiatrist, Dr. Harry Brown, that stated, "[w]ork on computer may not be appropriate at this time.  Best to have limited exposure." (Doc. No. 67, Depo. Exh. 31; Doc. No. 67, Medvey Depo. II at 89-93).   To comply with plaintiff's doctor's request, she was given temporary duties to perform.  (Orsaia Aff't ¶ 8). Defendant contends that it did not have any jobs to assign to

---

[15] The Correspondence Initiative was inherently transitional, as the position was created in response to case audits.  The Initiative was abandoned due to "a lot of downsizing going on at the company at that time."  (Doc. No. 67, Medvey Depo. I at 41-42).

plaintiff at that time because of the downsizing that was occurring at Oxford and the resulting hiring freeze; plaintiff's accommodation was to continue her disability leave of absence until she could return to her position, which required full-time use of the computer, or until Oxford could find plaintiff an alternative position for which she would be qualified. (Orsaia Aff't ¶¶ 8-10). Although plaintiff offered to "take anything[,] including receptionist work at reduced hours and reduced pay," (Doc. No. 83 at 10), Oxford was unable to find an alternate position for plaintiff until 2001, when defendant contacted plaintiff, interviewed her for several positions and offered her a part-time position, which plaintiff rejected. (Marlor Aff't ¶¶ 11-17).

Plaintiff only sought an alternate position after she gave Dr. Rabinowitz's note to defendant, and defendant promptly altered her position as the circumstances at that time allowed.[16] Moreover, plaintiff's supervisors repeatedly told her that she should pace herself to relieve some of the pressure and stress of the job. Additionally, defendant gave plaintiff a medical leave of absence which it extended after it did not have an accommodating placement available due to the company's financial difficulties.[17] Plaintiff

---

[16] As stated above, plaintiff was assigned to Oxford's Correspondence Initiative in the Issues and Resolutions Department, but as a result of downsizing within the company, plaintiff returned to her DSM work in the Medicare Group Accounts section. (Doc. No. 83 at 6-7; Doc. No. 66 at 3-4).

[17] While plaintiff was on medical leave from Oxford, she was employed as a personal assistant and then as a real estate agent. Although plaintiff states that "her employment has always been supported with some form of accommodation for her disability," her subsequent employers submitted evidence that

admits that "out of fear of losing employment opportunities, [she] did not request accommodations, and at times covertly implemented self accommodations in subsequent employment opportunities." (Doc. No. 83 at 29). However, plaintiff contends that she did "indicate" the availability of other more suitable positions for which she was qualified, but plaintiff concedes that these inquiries were not always made formally and that she searched independently for job openings on defendant's website. (Doc. No. 83-1, Medvey Depo. II at 70-71, 73; Doc. No. 83-1, Medvey Depo. IV at 100-01).

Defendant has "produced evidence that a hiring freeze frustrated any ability to find other positions for plaintiff, . . . and that defendant did make good faith attempts" and even offered plaintiff part-time work as such work later became available. Lester, 290 F. Supp. 2d at 25. (See Doc. No. 66 at 21-22). Additionally, plaintiff has "offered no evidence that other positions were available that would reasonably accommodate her alleged disability." Lester, 290 F. Supp. 2d at 25. Accordingly, plaintiff has not satisfied her burden of establishing that other positions were available to reasonably accommodate her alleged disability.

### d. ADVERSE EMPLOYMENT ACTION

Plaintiff contends that she "suffered the ultimate adverse employment action by way of Oxford's termination of her in November

---

plaintiff did not request such an accommodation.  (Doc. No. 91 at 7).

1999."[18]    (Doc. No. 83 at 30).    Plaintiff, however, offers no
evidence that she was terminated.  Rather, while plaintiff was on
a medical leave of absence from defendant, she went to work for a
new employer in a new career.

## 2.  COUNT SEVEN - RETALIATION

Defendant Oxford contends that plaintiff did not suffer
retaliation under the ADA because she did not engage in any
protected activity, defendant did not take an adverse employment
action against plaintiff, and plaintiff cannot demonstrate a causal
link between any protected activity and an adverse employment
action.    (Doc. No. 66 at 30-32; see Doc. No. 91 at 14-15).
Plaintiff counters that she was engaged in protected activity under
the ADA through her opposition to defendant's practices and through
defendant's failure to provide her with an accommodation;
subsequent to her denial of various employment positions after she
made her disability clearly known to defendant, plaintiff was
terminated without notice; and defendant's repeated discriminatory
practice of denying plaintiff an accommodation, is a direct and
causal link to her abrupt termination.    (Doc. No. 83 at 39-41).

---

[18] On November 11, 1999, Med Soft Corporation sent plaintiff a notice
detailing her rights to employee benefits under COBRA and describing her
relationship with defendant Oxford as terminated. (Doc. No. 83-1, Depo. Exh.
48). COBRA letters are sent to employees that voluntarily terminate employment
as well as those who are fired, and at that time, plaintiff was employed by
Grieb.  Moreover, while it appears plaintiff had found another suitable
career, defendant Oxford continued to send plaintiff available job
opportunities in 2001, long after plaintiff began her career in real estate.

The ADA retaliation provision protects any person who opposes an act or practice made unlawful by the ADA or who participates in any manner in an ADA proceeding.  42 U.S.C. § 12203.[19]  To state a claim for retaliation under the ADA, plaintiff must show that: (1) she engaged in an activity protected by the ADA; (2) the employer was aware of that activity; (3) an adverse employment action occurred; and (4) a causal link existed between the protected activity and the adverse employment action.  Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) (multiple citations omitted).

Protected activities under the ADA "include the filing of a complaint with the EEOC and opposition by employees against an employer's discriminatory practices." Sacay v. The Research Found. of the City Univ. of New York, 44 F. Supp. 2d 505, 509 (E.D.N.Y. 1999).  Such opposition typically takes "the form of making complaints to management or expressing support of coworkers who have filed formal charges." Id. (citation omitted).  Plaintiff must have a "reasonable belief that the . . . challenged actions of the employer violated the law." Id. (citation and internal quotations omitted).

---

[19] 42 U.S.C. § 12203(a) states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

Plaintiff filed her complaint with the Connecticut Commission on Human Rights and Opportunities ["CHRO"] nearly five months after she left Oxford and she did not appeal MetLife's decision to close her benefit file until two years after leaving Oxford. (Doc. No. 67, Exh. K). According to plaintiff, she "consistently, repeatedly and persistently sought appointment to a position capable of accommodating her inability to use multi-screened moving computer programs while accepting calls through a headset and from a queue." (Doc. No. 83 at 40). Plaintiff testified that she applied for a position in the Issues and Resolution Department and DSM; she made inquiries, mostly informal, about other available positions; she searched for job openings at Oxford on their website; and she offered to take a position as a "runner" or a receptionist but was denied. (Doc. No. 83-1, Medvey Depo. II at 70-71 & 73; Doc. No. 83-1 Medvey Depo. IV at 100-01; Doc. No. 83-1, Exh. F, Depo. Exh. 1; Doc. No. 83-1, Medvey Depo. I at 56).

Plaintiff's actions do not constitute "protected activities" under the ADA. See Peeples v. Coastal Office Prods., Inc., 203 F. Supp. 2d 432, 466 (D. Md. 2002), aff'd, 64 Fed. Appx. 860 (4th Cir. 2003). Plaintiff did not file any complaints with her employer during her tenure at Oxford and in no way made her employer aware of her "opposition" to defendant's alleged practices. In Peeples, the court rejected a claim of protected activity where the plaintiff notified his employer by e-mail that it was his

37

"understanding" that he was protected by the ADA. 203 F. Supp. 2d at 465. Plaintiff's actions in this case are even more tenuous, as plaintiff did not reference the ADA or even file her complaint with CHRO until nearly five months after she left Oxford.[20]

Because there is no evidence that plaintiff engaged in protected activity as defined by the ADA, nor is there evidence that defendant Oxford was made aware of any such activity, plaintiff cannot make out a prima facie case of retaliation under the statute. Moreover, because plaintiff cannot demonstrate that she opposed a protected activity under the ADA, she could not have suffered an adverse employment action and she cannot demonstrate a causal link between her protected activity and an adverse employment action where neither prerequisite element exists.

### 3. COUNT FOUR - DISCHARGE BECAUSE OF HER DISABILITY IN VIOLATION OF CONN. GEN. STAT. § 46a-51

According to defendant Oxford, plaintiff did not have a disability within the meaning of CONN. GEN. STAT. § 46a-51(15) because plaintiff's condition is neither chronic, nor a handicap, impairment, or infirmity as required by that statute (Doc. No. 66 at 24-26; Doc. No. 91 at 8-10); plaintiff was not rejected for any

---

[20] On August 25, 1998, plaintiff complained to her supervisor in an e-mail that "Dr. Rabinowitz . . . has indicated that the use of multiple screens at a consistently fast pace is not appropriate for me because it affects my vision and induces a physical state of vertigo." (Doc. No. 67, Depo. Exh. 18).

As a possible accommodation, plaintiff was aware that she could have requested a "busy out" capability, but plaintiff did not do so, even though she would still have been productive. (Doc. No. 67, Medvey Depo. III at 49-51; Doc. No. 83 at 6).

existing position at Oxford after informing defendant Oxford of her
disability (Doc. No. 66 at 27; Doc. No. 91 at 11-12); plaintiff did
not suffer an adverse employment action; and there are no
circumstances that can give rise to a reasonable inference of
discrimination because defendant Oxford was downsizing in the midst
of financial difficulties. (Doc. No. 66 at 27-29; Doc. No. 91 at
12-14). In response, plaintiff asserts that she satisfies the
prima facie case for disability within the meaning of the
aforementioned statute and that, as a result of that disability,
was rejected for existing positions at Oxford. (Doc. No. 83 at 31-
35). Plaintiff further argues that the present facts create a
reasonable inference of discrimination sufficient to sustain her
prima facie burden. (Id. at 36-38).

The Connecticut Fair Employment Practices Act ["CFEPA"]
provides, inter alia, that, except in the case of a bona fide
occupational qualification or need, "[i]t shall be a discriminatory
practice . . . [f]or an employer . . . to discriminate against any
such individual in compensation or in terms, conditions or
privileges of employment because of the individual's . . . physical
disability. . . ." CONN. GEN. STAT. § 46a-60(a)(1).[21]  "Federal

---

[21] "Connecticut and federal laws do not provide coextensive disability
discrimination coverage. . . ." Beason v. United Techs. Corp., 337 F.3d 271,
277 (2d Cir. 2003). The ADA has a "significant threshold," namely, that a
"physical disability substantially limit a major life activity." Id. CFEPA
does not have that same "restrictive threshold" and thus, a failure to satisfy
the "substantially limits" provision of the ADA's standard does not
automatically defeat a claim asserted under the broader state statute. See
id.

precedent concerning employment discrimination guides the enforcement of Connecticut's anti-discrimination statutes." Bernier v. Moskowitz, 117 F. Supp. 2d 126, 129 (D. Conn. 1999) (citations omitted). Accordingly, because plaintiff's case relies upon the disparate treatment theory of employment discrimination, Connecticut courts apply the McDonnell Douglas-Burdine model of analysis. See Ann Howard's Apricots Rest., Inc. v. Commission on Human Rights & Opportunities, 237 Conn. 209, 224-25 (1996); Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

Under both federal and state law, a plaintiff must show that (1) she was a member of a protected group; (2) she was qualified for the job; (3) she suffered an adverse employment decision; and (4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination. See Shaw v. Greenwich Anesthesiology Assocs., 137 F. Supp. 2d 48, 64-65 (D. Conn. 2001) (citations omitted). Once plaintiff establishes a prima facie case, the presumption of discrimination is created and the burden of production shifts to defendant to rebut the presumption by articulating some legitimate, nondiscriminatory reason for the adverse employment decision. See Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 108 (1996) (citations omitted). "Once the defendant offers a legitimate, nondiscriminatory reason, the plaintiff then has an opportunity to

prove by a preponderance of the evidence that the proffered reason is pretextual." Id. (multiple citations omitted).

To demonstrate that she is a member of a protected class under CONN. GEN. STAT. § 46a-60(a)(1), plaintiff must assert that she is physically disabled within the meaning of CONN. GEN. STAT. § 46a-51(15). "Physically disabled" refers to:

> any individual who has any <u>chronic</u> physical handicap,
> infirmity or impairment, whether congenital or resulting
> from bodily injury, organic processes or changes or from
> illness, including, but not limited to, epilepsy,
> deafness or hearing impairment or reliance on a
> wheelchair or other remedial appliance or device.

CONN. GEN. STAT. § 46a-51(15) (emphasis added). Defendant Oxford contends that plaintiff's condition is not "chronic." (Doc. No. 66 at 24-26).

The term "chronic" is not defined in CFEPA or in the legislative history of the statute. Both parties correctly note that "when left undefined by the legislature, [t]he words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed." Carothers v. Capozzielo, 215 Conn. 82, 129 (1990) (citations omitted). Black's Law Dictionary defines "chronic" as "of long duration or characterized by slowly progressive symptoms; deep-seated or obstinate or threatening a long continuance, distinguished from acute." Black's Law Dictionary 241-42 (6th ed. 1990). Relying on this definition, defendant contends that it is "glaringly obvious" that plaintiff does not meet this definition because, by her own assertions, her

condition was brought on in the workplace environment, yet she consistently performed well on the job and was productive. (Doc. No. 66 at 24-25). Plaintiff, conversely, contends that "it may be more appropriate to refer to the definition of 'chronic' as is available in Webster's New World Medical Dictionary – "[a]n illness that persists for a long period of time. . . . lasting [three] months or more." (Doc. No. 83 at 33, citing Webster's New World Medical Dictionary (2d ed. 2003)). According to plaintiff, her disability, that "began in 1987 and persists to this date," "effects [sic] her work," and "limits her in the totality of her life's activities." (Doc. No. 83 at 33).

Last year, the Second Circuit confronted this issue in a case previously before this Court, and recognized that "no definitive Connecticut interpretation of CFEPA addresses" what constitutes a "chronic" condition under CFEPA. Caruso v. Siemens Bus. Comm. Sys., Inc., 392 F.3d 66, 70-71 (2d Cir. 2004)["Caruso III"]. In that case, this Court granted summary judgment for the defendant on plaintiff's ADA and CFEPA claims, was reversed by the Second Circuit, Caruso v. Siemens Bus. Sys., Inc., 56 Fed. Appx. 536 (2d Cir. 2003)["Caruso I"], and then granted summary judgment for the defendant again, finding that the plaintiff was not "physically disabled" within the meaning of CFEPA, Caruso v. Siemens Bus. Comms., Inc., No. 3:00cv924, 2004 WL 235365 (D. Conn. Feb. 4,

2004)["Caruso II"].[22]  See also Caruso III, 392 F.3d at 70-72.  In
making that determination, this Court adopted the interpretation of
"chronic" advocated by the defendant and adopted by several courts
analyzing claims under the Act defining the term to mean "of long
duration or characterized by slowly progressive symptoms; deep-
seated or obstinate, or threatening a long continuance,
distinguished from acute."  See Caruso II, 2004 WL 235365 at *6.
See also Shaw v. Greenwich Anesthesiology Assocs., P.C., 137 F.
Supp. 2d 48, 65 (D. Conn. 2001); Gilman Bros. v. Connecticut Comm'n
on Human Rights & Opportunities, CV-950536075, 1997 WL 275578 at *4
(Conn. Super. Ct. May 13, 1997).  The Second Circuit has noted that
this definition of chronic is "consistent with the dictionary
definition of chronic which provides: Of diseases, etc.: Lasting a
long time, long-continued, lingering, inveterate."  Caruso I, 56
Fed. Appx. at 537 (quoting Oxford English Dictionary (2d ed.
1989))(internal quotation marks omitted).  Similarly, "inveterate"
means "[o]f long standing, chronic; hence, deep-seated and
resisting treatment."  Id.

     Despite plaintiff's contention that the term "chronic" should
merely relate to the duration of a condition or illness, the
accepted definition of the term requires that any inquiry into the

---

[22] In response to plaintiff's appeal, the Second Circuit certified, inter
alia, the following question: "What is the correct interpretation of
'chronic' disabilities under CFEPA?" Caruso, 392 F.3d at 72.  The Connecticut
Supreme Court never had an opportunity to answer that question as the parties
reached a settlement and the certified questions were withdrawn.  See Caruso
v. Siemens Bus. Communs. Sys., 418 F.3d 164 (2d Cir. 2005)["Caruso IV"].

chronic nature of a condition must also consider whether the condition is responsive to medical treatment and ameliorative measures. See Shaw, 137 F. Supp. 2d at 65 n.22. If plaintiff does not suffer from symptoms of her condition "when she is on her medication and she is able to take her medication such that she is not chronically handicapped, infirm[], or impaired then she would not be actually disabled under CONN. GEN. STAT. § 46a-60(a)(1)." Id.

Plaintiff contends that her condition is chronic and, therefore, inveterate because she has "suffered her infliction for 17 years," but, as Defendant correctly argues, a condition may be incurable, yet its symptoms may respond to treatment. (Doc. No. 83 at 35; Doc. No. 91 at 10-11). It is undisputed that plaintiff's condition responds to treatment with small doses of the medication Valium and, failing that, plaintiff compensates by reducing the pace and intensity of her work. (Doc. No. 66 at 11-12; Defendant Oxford's Statement ¶¶ 97-98; Plaintiff's Statement ¶¶ 97-98; Doc. No. 67, Medvey Depo. III at 16-17, 20; Doc. No. 67, Medvey Depo. II at 111). It is for this reason that plaintiff's condition cannot be considered chronic for the purposes of CONN. GEN. STAT. § 46a-60(a)(1).

Nor does plaintiff's condition rise to the level of a "physical handicap, infirmity, or impairment" as those terms are

44

commonly defined and as required by CFEPA.[23]  In turn, those terms are commonly defined as follows:

> Handicap – a disadvantage that makes achievement unusually difficult; especially: a physical disability that limits the capacity to work. Webster's Third New International Dictionary Unabridged (1966).

> Infirm – not strong or sound physically; of poor or deteriorated vitality especially as a result of age; feeble.  Id.

> Impair – to make worse; diminish in quantity, value, excellence, or strength; do harm to; damage, lessen. Id.

None of these definitions aptly describe plaintiff's condition.  Plaintiff can not be said to be handicapped, as she not only was not limited in her capacity to work, but she also "surpassed normal achievement in her job performance" as evidenced by consistently positive performance reviews and compliments from clients. (Doc. No. 91 at 8-10; Defendant Oxford's Statement ¶¶ 32, 36[24]; Doc. No. 67, Depo. Exhs. 15-16, 21, 23-25).  Plaintiff also continued normal achievement in her personal life as well, continuing to care for her household, travel, drive, exercise, and maintain hobbies.  (Doc. No. 83-1, Medvey Depo. I at 29-30; Doc. No. 67, Medvey Depo. II at 116-17; Doc. No. 67, Medvey Depo. III at

---

[23] As with the term "chronic," the Connecticut legislature left the terms "handicap," "infirmity" and "impairment" undefined and there is no legislative history to guide the Court's interpretation.

[24] In her Statement, plaintiff denies that she consistently received performance reviews of "Fully Performing Requirements" and complimentary e-mails; however documentary evidence conclusively proves otherwise.  See Plaintiff's Statement ¶ 36.

142-43; Doc. No.  67, Medvey Depo. V at 23-26; Doc. No. 67, Depo.
Exh. 4-7, 39).  For similar reasons, plaintiff is not impaired
within the meaning of CFEPA.  Finally, plaintiff's active life of
travel, exercise, and daily activities belie any claim that she
could be considered infirm.  Because plaintiff cannot establish
that she was disabled within the meaning of CFEPA, plaintiff is
unable to make out a prima facie case of discrimination under the
statute.

### B. DEFENDANT METLIFE

Defendant MetLife seeks summary judgment with respect to the
four counts addressed in Sections III.A.1-3, supra: disability
discrimination under CFEPA (Count Four); failure to provide
reasonable accommodation under the ADA (Count Five); violation of
the Rehabilitation Act (Count Six); and retaliation (Count Seven).
According to defendant MetLife, "[w]hile [defendant] may have been
properly named as a defendant with respect to [plaintiff's] ERISA
claims . . . , now that those claims have been dismissed,
[defendant] MetLife is no longer a proper defendant." (Doc. No. 70
at 1-2).  Defendant contends that the remaining claims are
preempted by ERISA (id. at 6-7; Doc. No. 89 at 2-3); plaintiff's
ERISA claims have been dismissed (Doc. No. 70 at 8; Doc. No. 89 at
2-3); and defendant was not plaintiff's employer, but was the
insurer and administrator of the Plan (Doc. No. 70 at 8-10; Doc.
No. 89 at 3-5).

46

In response, plaintiff asserts that her claims are not preempted by ERISA as defendant was the administrator of Oxford's Plan (Doc. No. 81 at 22-23), and "[f]or reasons that [defendant] MetLife held itself out as controlling administration and making decisions relative to the Plan, [defendant] Metlife is an indispensable party and a 'covered entity.'" (Id. at 23).

            1. ERISA PREEMPTION

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive [preemption] provisions, . . . which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S. Ct. 2488, 2495 (2004) (internal citations and quotations omitted). Specifically, ERISA preempts state laws insofar as they relate to any employee benefit plan. Id.; Callahan v. Unisource Worldwide, Inc., 2003 WL 1714369, *4-5 (D. Conn. March 26, 2003). Furthermore, state law claims relating to a misrepresentation of benefits are also preempted by ERISA. Callahan, 2003 WL 1714369 at *7.

Plaintiff is claiming a right to benefits and claiming that defendant MetLife misrepresented that it would provide benefits to her pursuant to the Plan. (See Doc. No. 71, Medvey Depo. I at 76-

79).[25]   Plaintiff's claims against MetLife are claims covered by ERISA.   It is undisputed that defendant Oxford's short term disability program constitutes an ERISA plan.  (See May 2002 Ruling at 7-9; Doc. No. 70 at 7).   However, as referenced above, plaintiff's ERISA claims were dismissed on February 6, 2003 by Judge Eginton.  (See February 2003 Ruling at 3-6).

### 2. METLIFE AS A "COVERED ENTITY"

Defendant MetLife contends that plaintiff cannot pursue her ADA, Rehabilitation Act or CFEPA claims because defendant MetLife was not plaintiff's employer but, rather, is the insurer and administrator of her health care plan.  (Doc. No. 70 at 8-10).

The ADA mandates that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the

---

[25] In response to an inquiry at her deposition as to what her claims are against defendant MetLife, plaintiff stated:

Q. So your claim against MetLife, if I understand it correctly, is that they failed to provide you with something called 'vocational rehabilitation,' which you understood was part of your benefit plan.  Correct?

A. Yes, and my healthcare benefits. . .

Q. That's your claim against MetLife. Am I right?

A. I think so.
. . .

Q. So, they misrepresented what your benefits were going to be. Is that what your claim is against MetLife?

A. Yes.

Q. And they failed to provide you with benefits that you thought you were entitled to?

A. Yes.

(Doc. No. 71, Medvey Depo. I at 77-79).

disability. . . ."  42 U.S.C. § 12112(a).[26]  A "covered entity"
means "an employer, employment agency, labor organization, or joint
labor-management committee."  42 U.S.C. § 12111(2).  To survive
summary judgment on these claims, plaintiff must establish that
defendant MetLife was her employer, a "covered entity" under the
statute.

The ADA defines "employer" as: "a person engaged in an
industry affecting commerce who has 15 or more employees for each
working day in each of 20 or more calendar weeks in the current or
preceding calendar year, and any agent of such person. . . ."  42
U.S.C. § 12111(5)(A).[27]  Though it is clear that plaintiff did not
work directly for defendant MetLife, "[a] defendant that does not
have a direct employment relationship with a plaintiff may
nonetheless be liable under . . . the ADA for its discriminatory
acts if it interferes with the plaintiff's employment opportunities
with a third party and the defendant controls access to those
opportunities."  United States v. New York State Dep't of Motor
Vehicles, 82 F. Supp. 2d 42, 46 (E.D.N.Y. 2000); see also Spirt v.
Teachers Ins. and Annuity Ass'n, 691 F.2d 1054, 1063 (2d Cir. 1982)
(citations omitted) (adopting the indirect employment rationale),
judgment vacated on other grounds, 463 U.S. 1223 (1983).  "Where an

---

[26] See footnote 9 supra.

[27] The Rehabilitation Act defines the term "employer" in virtually the same
terms as the ADA:  "The standards used to determine whether this section
has been violated shall be the standards applied under Title I of the Americans
with Disabilities Act. . . ." 29 U.S.C. § 794(d).

entity meets the statutory requirements of an 'employer' and exerts significant control over an individual's access to or terms and conditions of employment with a third party, that entity can be considered an 'employer' despite the absence of a common-law employment relationship with the individual." New York State Dep't of Motor Vehicles, 82 F. Supp. 2d at 47.[28]

The administrator of an insurance plan generally does not constitute a "covered entity." See, e.g., Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1113 (9th Cir. 2000); Pappas v. Bethesda Hosp. Ass'n, 861 F. Supp. 616, 619 (S.D. Ohio 1994); Dodd v. Blue Cross & Blue Shield Ass'n, 835 F. Supp. 888, 891 (E.D. Va. 1993).[29]

Defendant MetLife was the claims administrator and insurer for the benefit plan. (Rudell Aff't, ¶¶ 5-6). Plaintiff's only contact with defendant MetLife related to her disability benefits:

---

[28] Although plaintiff correctly observes that a plan administrator is an indispensable party in an action for a breach of its fiduciary duty, and the proper party defendant in an action concerning ERISA benefits is a party that controls the administration of the plan (see Doc. No. 81 at 22-23), plaintiff's ERISA claims have been dismissed.

[29] The Second Circuit held in Spirt that TIAA and CREF, independent insurance and pension funds that administer benefits for the university employer, exist solely for the purpose of enabling universities to delegate their responsibility to provide retirement benefits for their employees; such entity is "so closely intertwined" with the employer that the entity "must be deemed an 'employer' for purposes of Title VII." Spirt, 691 F.2d at 1063. Although MetLife has its own employees, it does not employ plaintiff; Oxford does not delegate employee compensation duties to MetLife; and MetLife is not Oxford's agent since there is no evidence before the Court that Oxford exercises the type of control that is required in a principal-agent relationship. See Peters v. Wayne State Univ., 691 F.2d 235 (6th Cir. 1982), cert. granted, judgment vacated and case remanded on different grounds, 463 U.S. 1223 (1983). MetLife and Oxford do not share a relationship so as to conclude that they are "so closely intertwined."

plaintiff applied for and received benefits while on medical leave
from May 22, 1999 to June 13, 1999 (Doc. No. 71, Medvey Depo. II at
83-84; Doc. No. 71, Depo. Exhs. 26, 29); on August 31, 1999,
defendant MetLife mailed plaintiff a "Personal Profile" so
defendant MetLife could evaluate plaintiff's condition, which
plaintiff completed and returned to defendant (Doc. No. 71, Medvey
Depo. II at 104-105, 108; Doc. No. 71, Depo. Exhs. 38-39); and
defendant MetLife terminated plaintiff's disability benefits on
October 22, 1999, after plaintiff obtained work with a new employer
(Doc. No. 71, Medvey Depo. III at 34-36; Doc. No. 71, Depo. Exh.
46). Moreover, any conversations that took place between defendant
MetLife and plaintiff related only to her disability benefits. The
facts as presented to the Court reveal that plaintiff did not
discuss job opportunities with defendant MetLife's representatives,
nor does plaintiff note any instance where defendant MetLife
exerted influence on plaintiff's employment opportunities with
Oxford.

## IV. CONCLUSION

Accordingly, for the reasons stated above, defendant Oxford's Motion for Summary Judgment as to Counts Four through Seven (Doc. No. 65) is **GRANTED**; and defendant MetLife's Motion for Summary Judgment (Doc. No. 69) is **GRANTED**.  The Clerk is directed to close this case.


SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this __ day of September, 2005.